**WHIRLPOOL CORPORATION,**
Plaintiff/Counter-defendant,

v.

**U.M.C.O. INTERNATIONAL CORP., UMCO S.A., UMCO, C.A., and R. Clayton Umbel, Defendants/Counter-plaintiffs.**

**U.M.C.O. INTERNATIONAL CORP., Plaintiff,**

v.

**WHIRLPOOL CORP., Defendant.**

Nos. 85–3466–CIV–WMH, 88–0868–CIV–WMH.

United States District Court, S.D. Florida.

Oct. 16, 1990.

Philip T. Crenshaw, West Palm Beach, Fla., for plaintiff.

Peter W. Homer, Centrust Financial Center, Miami, Fla., for defendant.

HOEVELER, District Judge.

This action involves two consolidated cases, both of which are before the Court on two motions for summary judgment by Whirlpool Corp. (hereinafter "Whirlpool"), against UMCO International (hereinafter "UMCO").

## I.  Background

In late 1984, UMCO entered into negotiations with Whirlpool to establish a distributorship in Puerto Rico for Whirlpool products. UMCO's stated objective was to take over what it feels was an "exclusive" distributorship in Puerto Rico which was formerly enjoyed by the Protane Gas Company. On December 21, 1984, UMCO executed a standard Whirlpool distributorship to be effective December 28, 1984, for a one year period ending December 28, 1985. There is no explicit term in the agreement which grants to UMCO the same exclusive rights and privileges that it contends were previously held by Protane Gas. It is UMCO's disappointment over its unrequited desire to be Whirlpool's "exclusive dealer" which animates the conflict now unfolding before this Court.

Whirlpool's interests did indeed lie beyond an exclusive relationship with UMCO. Approximately six weeks prior to Whirlpool's execution of the agreement with UMCO, Whirlpool had entered into another distributorship agreement with Western Auto Sales (hereinafter "Western Auto"), which contemplated entering the Puerto Rican market sometime in 1985. UMCO, however, was not wholly in the dark concerning this agreement between Whirlpool and Western Auto, and had in fact made inquiries as to what impact the Whirlpool/Western Auto liaison would have on the Whirlpool/UMCO relationship.

In the Fall of 1985 Whirlpool began supplying Western Auto of Puerto Rico, and the relationship between UMCO and Whirlpool soured. By Spring of 1985 UMCO had initiated this action against Whirlpool in the Superior Court of Puerto Rico. The allegations included violations of Law 75, Dealers' Contracts, 10 L.P.R.A. sec. 278 et seq. for impairment of its distributorship agreement; and violations of the Puerto Rico Anti–Monopoly Act, 10 L.P.R.A. sec. 263 (the Puerto Rican counterpart of the Robinson–Patman Act) for price discrimination. This action was removed on grounds of diversity of citizenship in April of 1985 to the United States District Court for the District of Puerto Rico.

Now in federal court, UMCO moved to enjoin Whirlpool from selling its products to Western Auto. The plot then thickens. Pursuant to this motion for injunction, there was an evidentiary hearing during which Whirlpool learned of certain dealings

which caused it to conclude that UMCO had been bribing Whirlpool's sales manager. In redress for these alleged bribes, Whirlpool initiated its own proceedings before this Court for violations of the Federal Racketeering Influenced Corrupt Organizations Act (RICO).

In an effort to sort out the chain of events, a brief recapitulation might prove helpful. First, UMCO expresses its desire to be an exclusive Whirlpool dealer, signs a non-exclusive dealership contract, and files suit against Whirlpool when Whirlpool begins dealing with Western Auto. Then, Whirlpool learns of suspected bribes being made by UMCO to Whirlpool's man in the field, and responds to this affront with a RICO action in the Southern District of Florida. The two actions were consolidated. Now before this Court are Whirlpool's two motions for summary judgment. The first motion arises from UMCO's first action, which for clarity's sake will hereinafter be called the "Puerto Rico Action". The second motion is directed against UMCO's counterclaims in the second action, hereinafter to be referred to as the "Florida Action". The two motions are examined in turn, below.

II. Standard on Summary Judgment

The standard to be applied in reviewing a summary judgment motion is stated unambiguously in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

As set forth in the Rule, summary judgment may be entered only where there is no genuine issue of material fact. Moreover, the moving party bears the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142, 154 (1970).

In applying this standard, the Eleventh Circuit has explained that:

> In assessing whether the movant has met this burden, the courts should view

the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608; [*Environmental Defense Fund v.*] *Marsh,* 651 F.2d [983] at 991 [5th Cir.1981]. All reasonable doubts about the facts should be resolved in favor of the non-movant. *Casey Enterprises v. Am. Hardware Mutual Ins. Co.,* 655 F.2d 598, 602 (5th Cir. 1981). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Marsh,* 651 F.2d at 991; *Lighting Fixture & Elec. Supply Co. v. Continental Insurance Co.,* 420 F.2d 1211, 1213 (5th Cir.1969). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply,* 420 F.2d at 1213. . . .

> Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. at 160, 90 S.Ct. at 1609–10; *Marsh,* 651 F.2d at 991. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied, notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg,* 370 F.2d 605, 611–612 (5th Cir. 1967). *See, Dalke v. Upjohn Co.,* 555 F.2d 245, 248–49 (9th Cir.1977).

*Clemons v. Dougherty County, Ga.,* 684 F.2d 1365, 1368–1369 (11th Cir.1982).

In opposing a motion for summary judgment, the non-moving party may not rest upon mere allegations, but must rebut any facts presented by the moving party in order to demonstrate the existence of a genuine and material issue of fact for trial. *Adickes* 398 U.S. at 160, 90 S.Ct. at 1609, 26 L.Ed.2d at 156. Furthermore, the mere existence of a scintilla of evidence in support of the non-movant's position is in-

sufficient; there must be evidence on which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 214 (1986). In determining whether this evidentiary threshold has been met, the trial court must "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Id.* 477 U.S. at 254, 106 S.Ct. at 2513, 91 L.Ed.2d at 215. If the non-movant fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted. *Id.* 477 U.S. at 253, 106 S.Ct. at 2512, 91 L.Ed.2d at 215. Moreover, summary judgment is mandated, if after adequate time for discovery, the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party would bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986).

### III. The Puerto Rico Complaint

There are two main thrusts to UMCO's Puerto Rico action. First, UMCO argues that Whirlpool's dealings with Western Auto are in violation of Puerto Rico's "Law 75" which protects the rights of distributors against suppliers. Second, UMCO alleges that the Whirlpool/Western Auto relationship is in violation of the Puerto Rico Anti–Monopoly Act 10 L.P.R.A. Section 263, which is the Puerto Rican equivalent to the Robinson Patman Act.

### A. UMCO'S CLAIM UNDER LAW 75

In Count I of the Puerto Rico action, UMCO claims that Whirlpool's dealings with Western Auto were detrimental to the established exclusive dealing arrangement between UMCO and Whirlpool, and thus in violation of Law 75, which provides that:

> Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the estab-

lished relationship or refuse to renew said contract on its normal expiration, except for just cause.

10 L.P.R.A. Sec. 278a. "The Legislature of Puerto Rico enacted Law 75 with the purpose of injecting stability and creating leverage between the parties to a distributorship contract, in order to impede arbitrary impairments or termination by principals after a distributor had created a favorable market for its product." *General Office Products Corp. v. Gussco Mfg. Inc.,* 666 F.Supp. 328, 330 (D.Puerto Rico 1987) *citing* 18 *Dario de Sesiones* 1531 (1964).

Whirlpool's simple response to UMCO's claim under Law 75 is that there was no exclusive dealing arrangement between the parties, and thus Whirlpool's supplying to Western Auto can visit no injury to the "established" UMCO/Whirlpool relationship. The task at hand is therefore to determine whether exclusivity was in fact a component of the relationship established between the parties, or merely the fanciful yearning of UMCO.

#### 1. *Law of the Case*

This, however, is not the first occasion that a court of law has pondered the fact or fancy of exclusivity between the parties at bar. While this action was pending in the District Court for the District of Puerto Rico, Whirlpool filed a motion for summary judgment which raised the identical argument now faced by this Court. The District Judge in Puerto Rico, Carmen Consuelo Cerezo, referred the matter to United States Magistrate Justo Arenas, who issued a Report and Recommendation on June 29, 1987, recommending that the motion for summary judgement on this claim under Law 75 be denied. In an Order dated April 18, 1988, Judge Cerezo adopted the recommendation of the Magistrate. Presently consolidated with another action before this Court, Whirlpool presents this motion for summary judgment in what is effectively "another bite at the apple." Understandably, UMCO claims that this issue, already having been decided by Judge Cerezo, should not be reopened by this Court, and further suggests that this Court

is barred from revisiting the issue by the doctrine of the "law of the case".

██ The "law of the case" doctrine is not, however, as restrictive of the this Court's jurisdiction as UMCO would believe. The Eleventh Circuit case of *Robinson v. Parrish*, 720 F.2d 1548 (11th Cir. 1983), is particularly instructive on this point. In *Robinson*, a subsequent judge granted a motion for summary judgment which an earlier judge had rejected. The Eleventh Circuit held that plaintiffs were "misguided in arguing that the 'law of the case' doctrine should have barred the district judge below from ruling contrary to the previous district judge":

> The "law of the case" doctrine is "the rule under which the trial court and appellate courts are bound by any findings of fact or conclusions of law made by the appellate courts in a prior appeal of the case at issue." *United States v. Burns*, 662 F.2d 1378 (11th Cir.1981). The purpose of the doctrine is to bring an end to litigation by foreclosing the possibility of repeatedly litigating an issue already conclusively decided *White v. Murtha*, 377 F.2d 428 (5th Cir.1967)....
>
> To hold that a district court must rigidly adhere to its own rulings in an earlier stage of a case would actually thwart the purpose of the doctrine. New developments or further research often will convince a district court that it erred in an earlier ruling, or the court may simply change its mind. We believe it would be wasteful and unjust to require the court to adhere to its earlier ruling in such an instance.

*Robinson*, 720 F.2d at 1549–50. *See also United States v. Williams*, 728 F.2d 1402 (11th Cir.1984); *Cale v. Johnson*, 861 F.2d 943, 948 (6th Cir.1988) (denial of summary judgment motion does not foreclose granting of motion by subsequent judge); *Paulson v. Greyhound Lines, Inc.*, 628 F.Supp. 888, 891 (D.Minn.), *aff'd*, 804 F.2d 506 (8th Cir.1986) (law of the case did not prevent granting of motion for summary judgment even though predecessor judge had twice

denied same motion). In light of the authority discussed above, it is clear that no barrier precludes reexamination of Whirlpool's motion. Having now revisited the matter however, the Court concurs with the result reached by the Magistrate that the summary judgment be denied, but differs (as explained below) with the basis on which such a result should be premised.

### 2. *Reexamination of the Issues Presented*

Under Law 75, Whirlpool is prohibited from acting to the detriment of the "established relationship" between itself and UMCO. Accordingly, the first issue confronted by the Magistrate, and reexamined now, regards the exclusivity of the contractual relationship between the parties.

### a. Exclusivity of the Contract

The contract itself is unambiguous; it contains no term granting or even implying exclusivity. It is a well settled tenet of Puerto Rican law that where a contract is unambiguous, its literal meaning must be applied. 31 L.P.R.A. Section 3471. Moreover, Plaintiff actually requested an exclusivity clause, which was denied by Whirlpool. Transcript of the Preliminary Injunction hearing at page 213.[1] Furthermore, the very plausibility of an exclusive contract is undermined by Plaintiff's established knowledge before the signing of the contract, of Western Auto's planned entry into the Puerto Rican market for the sale of Whirlpool products. (Tr. 197, 200, 317–318, 332–333). In whole, the Magistrate concluded, and this Court agrees, that the contract gives no support whatsoever to UMCO's claim of exclusivity. Failing to demonstrate exclusivity from the face of the contract, UMCO shifts its argument beyond the world of *written* contract and into the largely uncharted realm of "Aquilian fault", or *in culpa contrahendo*—the basis on which the Magistrate grounded his decision to recommend denial of the motion.

---

**1.** Further references to the transcript of the preliminary injunction hearing will be referred to as "Tr.".

### b. In Culpa Contrahendo

■ Having concluded that the contract was not intended to be exclusive, the Magistrate nevertheless denied Whirlpool's motion for summary judgment based on the arcane principle of *culpa in contrahendo.* As stated in the Magistrate's Report and Recommendation:

> In Puerto Rico, the civil code, grounded on values of good faith and the doctrine of *culpa in contrahendo,* may impose extra-contractual liability ("Aquilian fault") under Art. 1802, 31 L.P.R.A. Section 5141,[2] on whoever acts in a tortious or wrongful manner during preliminary negotiations. *Produciones Tommy Muniz, Inc. v. Comite Organizador de los VIII Juegos Panamericos (COPAN),* 113 D.P.R. 517, 529, 13 Official Translations 666, 679 (1982) (unjustified withdrawal from negotiations breached good faith imposed by precontractual relations and abused the legal right to withdraw, imposing liability for damages): "Good faith ... imposes on the parties negotiating or attempting to negotiate, an archetype of social conduct, loyalty and fidelity to the word given ... and consists in that every party to the contractual relation commits himself trustingly to the loyal conduct of the other party. Each confides in that the other will not defraud him ... The parties are under the obligation to conduct themselves according to good faith in the sense that each is burdened by a reciprocal loyalty to observe a conduct that is socially valuable and demandable." *Id.* at 528, 13 Official Translations at 678.

The Magistrate continues:

> Concomitantly, the exercise of a right carried out in an abusive manner is a source of liability, such abuse occurring when it "exceeds the limits imposed by good faith or by the social or economic end of said right." *Id.* (quoting *Velilla v. Pueblo Supermarkets, Inc.,* 111 D.P.R. 585, 588 (1981), and citing *Soriano Tavarez v. Riviera Anaya,* 108

D.P.R. 663 (1979)). Just as withdrawal from precontractual negotiations when consummation is reasonably expected constitutes conduct actionable under Art. 1802, *Id.* at 529, 13 Official Translations at 678–679, so also here, setting up a reasonable expectation of compliance with a critical term upon which plaintiff moved in reliance, and subsequent noncompliance, if all elements are proven, imposes liability under Art. 1802....

> United States law is not unaware of the underlying values of good faith and of the doctrine of *culpa in contrahendo.* Case law acknowledges precontractual liability on grounds similar to those applied by civil law in notions of good faith and *culpa in contrahendo,* through the legal institutions of "promissory estoppel," *Hoffman v. Red Owl Stores, Inc.* [26 Wis.2d 683], 133 N.W.2d 267 (1965); *Chrysler Corporation v. Quimby* [51 Del. 264], 144 A.2d 123 (1958), and "negligent misrepresentation," *Guilbert v. Phillips Petroleum Company,* 503 F.2d 587 (6th Cir.1974). *See also* Kessler & Fine, *Culpa in Contrahendo, Bargaining in Good Faith, and Freedom of Contract: A Comparative Study,* 77 Harv.L.Rev. 401, 448 (1964).

Ultimately, in his recommendation, the Magistrate concludes that based on the doctrine of *culpa in contrahendo,* the motion for summary judgment should be denied since "if the elements are proven, the noncompliance would be an act detrimental to the relationship in [violation of Law 75]."

After study of the doctrine, however, this Court hesitates to apply it to the facts at bar. The doctrine of *culpa in contrahendo* which literally means "fault in negotiating" dates back to 1861 and was first introduced in Germany to remedy "instances where a party by 'lack of diligence' had prevented the consummation of a valid contract ... [Thus the negligent party is] held liable to the innocent party who had suffered damages [in reliance] on the valid-

---

**2.** The civil law doctrine of *culpa in contrahendo* is embodied in Art. 1802, 31 L.P.R.A. sec. 5141 which states that: A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done. Concurrent imprudence of the party so aggrieved does not exempt from liability, but entails a reduction of the indemnity.

ity of the contract." See generally, Kessler & Fine, *Culpa in Contrahendo, Bargaining in Good Faith, and Freedom of Contract: A Comparative Study*, 77 Harvard L.Rev. 401 (1964). While this doctrine has not been adopted in this country except in Louisiana [3] and in Puerto Rico, it has been discussed by other jurisdictions as well. However, of the all cases found referring to the doctrine, none involves circumstances in which a contract was actually consummated by the parties. Rather, the doctrine appears to have been applied without exception only to situations in which one of the parties relied upon a contract being formed at some point in the future, and failing such contractual binding was prevented from realizing certain reasonable expectations. *See Kethley v. Draughon Business College*, 535 So.2d 502, (La.App. 2 Cir.1988); *Associated Executive Control, Inc. v. Bankers Union Life Insurance Co.*, 425 So.2d 800 (La.App. 4 Cir.1983); *Unit Two Architects, Inc. v. Modica*, 376 So.2d 979 (La.App. 1 Cir.1979); *West Baton Rouge Parish School Board v. T.R. Ray, Inc.*, 367 So.2d 332 (La.1979); *Coleman v. Bossier City*, 305 So.2d 444 (La.1975). In the case of *Snyder v. Champion Realty Corp.*, 631 F.2d 1253 (5th Cir. 1980), the former Fifth Circuit addressed the applicability of *culpa in contrahendo* to a case involving a brokerage contract for payment of a commission upon sale of a tract of land. The contract provided that the brokers would be paid the excess of any money over $125 per acre paid for the land by a buyer procured by them. Thereafter, a buyer who was originally willing to pay $150 per acre, defaulted twice on the sale and the seller negotiated directly with the buyer to effect a sale on credit at a lower price. The brokers sued to recover their commission and the court affirming summary judgment in favor of the defendant seller held:

> The plaintiffs, somewhat uncertain how to pigeon-hole their claim, argue that despite the terms of the brokerage contract, Champion is guilty of "legal fault", a kind of constructive bad faith, under

the civilian doctrine of *culpa in contrahendo*. The doctrine is, in general terms, the civilian equivalent of the common law concept of promissory estoppel. It is used as a basis for compensating one party for his expenses incurred in reliance on another party's offer to form a unilateral contract where that offer is withdrawn before acceptance. See Comment, *Culpa in Contrahendo, in German French and Louisiana Law*, 15 Tul.L.Rev. 87 (1940). *It has nothing to do with this case.* (emphasis added).

631 F.2d at 1255–56.

Even the primary case relied on by the Magistrate in his recommendation, *Produciones Tommy Muniz, Inc. v. Comite Organizador de los VIII Juegos Panamericos (COPAN)*, 113 D.P.R. 517, 529, 13 Official Translations 666, 679 (1982) involved a situation where contract formation *was prevented* by unjustified withdrawal of one of the parties. Indeed, Puerto Rico case law indicates that the doctrine is a doctrine of "extra-contractual liability" which does not apply where a contract has been consummated. *Produciones Tommy Muniz, Inc. v. Comite Organizador de los VIII Juegos Panamericos (COPAN)*, 113 D.P.R. 517, 529, 13 Official Translations 666, 676–679 (1982). *See also Arroyo v. Caldas*, 68 P.R.R. 639, 641 (1948) (Section 1802 (*culpa in contrahendo*) is "confined to ... fault or negligence without there existing a prior obligation or a contract."); *Falcon v. E.M. Amy & Sons, Inc.*, 87 P.R.R. 527, 533 (1963) ("Since the action filed herein stemmed from the nonperformance of the contractual obligation, it does not arise by virtue of Section 1802").

The Magistrate cited to no case in which this doctrine was applied to a contract already in existence. Nor has UMCO alerted this Court to any such authority. In short, although providing an interesting historical detour, this Court does not find that the doctrine of *culpa in contrahendo* provides a theory with which UMCO can overcome Whirlpool's motion for summary judgment. However, as examined below, there is an-

---

**3.** *See generally,* La.Rev.Stat. Sec. 37:145 and La. Civ.Code Art. 1878 and Art. 1967, Louisiana Statutes Annotated. *See also, Kethley v. Drau-* *ghon Business College*, 535 So.2d 502, 506 n. 2 (La.App. 2 Cir.1988).

other basis whereby UMCO may successfully withstand summary judgment.

### c. Impairment of the "Established Relationship"

Having explored the little known terrain of *in culpa contrahendo*, the Court presently returns to a scrutiny of the statute under which UMCO pursues its claim: Puerto Rico's Law 75, which states that:

Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the *established relationship* or refuse to renew said contract on its normal expiration, except for just cause.

10 L.P.R.A. Sec. 278a. (emphasis supplied).

Failing to demonstrate that its contractual relationship with Whirlpool was "exclusive", UMCO nonetheless claims that the "established relationship" between the parties provided for exclusivity, and that Whirlpool's dealings with Western Auto were therefore in contravention of Law 75. Thus the threshold inquiry concerns the nature of the "established relationship" between the parties. Whirlpool argues that the relationship is established by the terms of the contract which do not provide for exclusivity. In response, UMCO contends that the "established relationship" provision of Law 75 is not limited to the integrated contract, but rather includes the "understanding" between the parties that the relationship was to be exclusive.

■ The stated purpose of Law 75 is to provide a protective supplement to all dealer/supplier contracts in an effort to equalize the bargaining inequity between the large principals and the smaller dealers:

The traditional provisions which regulate contracts between parties have shown their inefficacy in protecting the legitimate rights of the representative or agent, making it thus necessary to legislate in order to regulate this relationship and guarantee that manufacturers act in good faith, fairly, and not in an arbitrary manner, and to safeguard the rights and justified expectation of the representatives and agents inherent to the relationship.

*Medina & Medina v. County Pride Foods, Ltd.*, 858 F.2d 817, 820 (1st Cir.1988) (*quoting* 18 Dario de Sesiones 1531 (1964)). Indeed, as one commentator recently explained:

[T]he expressed legislative intent was to protect the "legitimate expectations and interests" of distributors or agents in ways in which traditional principles of contract law had not been effective. The termination of dealerships could no longer be left up to the reparations provided by general contract law.

Vidal, *The Concept of Just Cause for the Lawful Termination of a Dealership Under the Dealer's Contracts Law of Puerto Rico*, 58 Revista Juridica U.P.R. 261, 267 (1989). Thus, an interpretation of law 75's protection of the dealer's "established relationship" with the supplier cannot be limited to the provisions of the contract, but rather extends to a protection of the "legitimate expectations" of the dealer.

■ However, since the UMCO/Whirlpool contract does not provide for exclusivity, UMCO clearly has the burden of demonstrating a factual dispute as to whether the "established relationship" provided for exclusivity. In support of this burden, UMCO presents the sworn statement of Robert Segota, the Latin American and Caribbean sales manager for Whirlpool from October 1978 to August 1985, who testifies that it was Whirlpool's practice to treat their distributors as exclusive dealers in their "prescribed marketing areas". Accordingly, Mr. Segota explains that Protane Gas Co., UMCO's predecessor, was considered the Whirlpool's exclusive distributor for Puerto Rico. It is Mr. Segota's opinion that when UMCO acquired the Whirlpool distributorship from Protane, that this acquisition was on an "exclusive basis". Mr. Segota states that UMCO was informed by Whirlpool that Western Auto would be entering the market as a retailer, and therefore subject to the wholesale markups traditional to the appliance industry for retail appliance dealers, thereby benefitting from prices that were "signifi-

cantly lower than the prices at which Western Auto Puerto Rico would be purchasing the products." Mr. Segota further states that he understood, and informed UMCO, that Whirlpool would ship to a Western Auto's regional distribution center (warehouse) and thereafter unload and reload for shipment to Puerto Rico and therefore Western Auto would have significantly higher freight and transportation costs. Thus, according to Mr. Segota, Whirlpool gave UMCO every reason to believe that UMCO would not be in direct competition with Western Auto for the Puerto Rican market. Mr. Segota's statement alone raises a disputed fact as to the nature of the "established relationship" between UMCO and Whirlpool.

Additionally, the affidavit of Clayton Umbel, the president of UMCO sets forth that:

5. During UMCO's negotiation and discussions with Whirlpool regarding the acquisition of Protane's assets, I questioned Whirlpool and was informed by its representatives that a large chain retailer, Western Auto, would soon commence purchasing and selling the Whirlpool product line through its retail outlets in Puerto Rico. I was assured, however, that Western Auto would not receive distributor prices and, therefor, UMCO would not be in direct competition with Western Auto at the same functional level of distribution.

6. Upon inquiry into the nature of Western Auto's pricing and distribution system with Whirlpool, I was informed that potential areas of conflict existed between UMCO and Western Auto regarding pricing and distribution of spare parts. In response to my telex, I was informed that Western Auto would not be in a position to sell spare parts at wholesale prices because Western Auto would buy these parts as a dealer. This representation was consistent with dealer contracts and with previous statement

to me from Whirlpool that its prices to Western Auto would not place UMCO and Western Auto in direct competition in the Puerto Rico market.

As reflected by the testimony of both Robert Segota and Clayton Umbel, there remains a controverted issue of fact as to the nature of the relationship established between the parties, thus rendering inappropriate Whirlpool's motion for summary judgment on this issue.

## B. UMCO'S CLAIM OF PRICE DISCRIMINATION

In Count III of its Puerto Rico complaint, UMCO claims that Whirlpool violated Section 263 of the Puerto Rico Anti–Monopoly Act, 10 L.P.R.A. Sec. 263, by charging lower prices to Western Auto than were offered to UMCO. Section 263(a) provides:

It shall be unlawful for any person, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where such commodities are sold for use, consumption, or resale in Puerto Rico, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce in Puerto Rico, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

This statute was patterned after, and in all material respects is identical to Section 2(a) of Clayton Act, as amended by the Robinson–Patman Act, 15, U.S.C. Sec. 13(a). Accordingly, federal precedents construing the Robinson–Patman Act are applicable to the interpretation of Section 263.[4]

UMCO contends that its actual price of doing business for the same product was greatly different from the price enjoyed by Western Auto since Western Auto received advantageous credit terms while UMCO

---

4. Puerto Rico commentators and courts have stated that interpretations of the Federal Robinson–Patman Act are to be looked to in construing Section 263. *See, e.g.,* Estrella, *Antitrust Law in Puerto Rico,* 28 Revista Juridica del Colegio de Abogados, No. 3, pg. 615 (It is hornbook law that when a statute is adopted from a foreign jurisdiction, it is presumed to be adopted with the interpretation of the jurisdiction of origin.) *See also Corretger v. District Court,* 1951, 72 PRR 704, 710.

was wholly denied credit, and Western Auto benefitted from a warranty reimbursement program which was denied UMCO. In response, Whirlpool maintains that it is entitled to summary disposition for this claim on two grounds. First, Whirlpool argues that disparate credit terms and warranty programs cannot, as a matter of law, form the basis of an action under either the Robinson–Patman Act or Section 263. Second, Whirlpool claims that even if disparate credit terms were discriminatory, then UMCO's claim must still fail since it has failed to show "antitrust injury", whereby claimant must show that the alleged injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co.*, —— U.S. ——, 110 S.Ct. 1884, 1189, 109 L.Ed.2d 333 (1990).

### 1. *Disparate Credit Terms as Price Discrimination*

■ Regarding the alleged discrimination in credit terms, Whirlpool maintains that such credit variance is not, as a matter of law, actionable under the Robinson–Patman Act or Section 263. This contention is not, however, supported by the case law. In the case of *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648, 100 S.Ct. 1925, 1928, 64 L.Ed.2d 580 (1980), the Supreme Court stated, albeit in the context of price-fixing agreements, that credit terms are "inseparable" from price:

> It is virtually self-evident that extending interest-free credit for a period of time is equivalent to giving a discount equal to the value of the use of the purchase price for that period of time. Thus, credit terms must be characterized as an inseparable part of the price.

Because credit, by its very nature, involves delicate assessments concerning financial strength, business experience, and many other factors, a court should be cautious in allowing disparate credit terms to provide the basis for a price discrimination claim. This caution should not, however, induce blindness to a particularly egregious use of

credit which could operate effectively to produce wide variance in price.[5] In short, a party must be allowed a reasonable latitude in setting its credit terms, but must be prevented from cloaking discriminatory pricing under the veil of available credit. There is no requirement that all buyers be offered the same credit terms, merely that they be evaluated under the same standards for granting or denying credit. As stated by one court: "a manufacturer is free to extend different [credit] terms to competing purchasers so long as it makes its decisions in a non-discriminatory manner, i.e., the same standards of credit worthiness must be extended to all applicants for credit who are in competition with each other." *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 502 F.Supp. 637, 647 (D.N.J. 1980).

■ In the case at bar, UMCO has provided testimony that its prior favorable credit terms were completely revoked by Whirlpool in late October 1985, while Western Auto continued to enjoy Whirlpool's credit. As recounted by the president of UMCO, Mr. R. Clayton Umbel:

> 9. As of October 30, 1985, UMCO had 120–day payment terms with Whirlpool and a $500,000 open line of credit with Whirlpool. UMCO also had previously provided Whirlpool with standby letters of credit totaling approximately $2.3 million.... [Then] Without prior warning, by letters dated October 30, 1985, UMCO received notice that the existing credit practices between Whirlpool and UMCO were immediately cancelled....
>
> 10. At no time prior to these actions did Whirlpool express any dissatisfaction with UMCO's performance or any of its obligations under the distributorship agreements. Whirlpool did not provide any reasons prior to its actions as described in paragraph 9 above.
>
> 11. As a result of Whirlpool's unilateral modification of the credit terms, UMCO was permitted to purchase products for the remainder of the distributor-

---

**5.** *See e.g., Craig v. Sun Oil Company of Pennsylvania* 515 F.2d 221, 224 (10th Cir.1975) ("We do not say that there could not be a discrimination

in credit of such magnitude or nature as to constitute a violation, but no such extreme situation was alleged here").

ship year only on a cash basis or irrevocable letter of credit. UMCO's Puerto Rican distributorship was impaired. UMCO was unable to fill orders for November and December 1985 because it did not have the cash flow with which to buy products from Whirlpool. Prior to the change in credit terms, UMCO had negotiated and paid for stand-by letters of credit which it was unable to use following the change. The cancellation of the credit terms also caused UMCO to raise the prices of Whirlpool products to UMCO's customers.

12. In contrast, Western Auto was provided with more favorable credit terms....

The above statements support the allegation that the credit term discrimination was sufficiently extreme to create an action for price discrimination, thus precluding summary judgment on this issue.[6]

### 2. *Antitrust Injury*

■ UMCO's treble damage claim is brought under the Puerto Rico counterpart to Section 4 of the Clayton Act, 10 L.P.R.A. Sec. 268(a). As most recently articulated by the Supreme Court, a private plaintiff may not recover damages under Section 4 of the Clayton Act (or Section 268(a)) merely by showing injury causally linked to an illegal presence in the market. *Atlantic Richfield Co. v. USA Petroleum Co.,* —— U.S. ——, 110 S.Ct. 1884, 1189, 109 L.Ed.2d 333 (1990). In order to state a cause of action under Section 4 or Section 268(a), a plaintiff must show "antitrust injury", meaning that the alleged injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atlantic Richfield,* 110 S.Ct. at 1189. Thus, even if UMCO shows that Whirlpool's disparate credit terms were in violation of Section 263, its claim is nevertheless insufficient as a matter of law unless it can establish that the alleged injury flowed

from the anticompetitive practice challenged, and not some other cause.

Whirlpool contends that UMCO has failed to show antitrust injury since its damages resulted, not from any discriminatory actions by Whirlpool, but rather through UMCO's own competitive shortcomings.[7] In response, Plaintiff has submitted the affidavit of UMCO's president, Mr. R. Clayton Umbel, in which it is stated that Whirlpool's pricing discrimination through disparate credit terms caused UMCO to be "unable to fill orders for November and December 1985 because it did not have the cash flow with which to buy products from Whirlpool." There is no need to probe further; such testimony creates a controverted issue of fact as to the damages flowing from Whirlpool's alleged price discrimination, and is therefore sufficient to preclude summary judgment on this matter.

### IV. THE FLORIDA ACTION

As noted in Section I of this Order, 1985 was a bad year for the Whirlpool/UMCO relationship. In the Fall of 1985, Whirlpool suspected UMCO of bribing Whirlpool's Caribbean sales manager. On October 30, 1985, Whirlpool notified UMCO by letter that it would not be reappointed in Puerto Rico when its current distributorship agreement expired on December 31, 1985. In the same letter, Whirlpool further notified UMCO that, for the remaining two months of the agreement, Whirlpool would accept UMCO's orders only if they were accompanied by payment in full or were covered by a confirmed irrevocable letter of credit acceptable to Whirlpool's Credit Department. Then, on October 31, 1985, Whirlpool filed this action ("Florida Action") before this Court alleging violations of the Federal Racketeering Influenced Corrupt Organizations Act (RICO). UMCO filed counterclaims to this Florida action,

---

6. Since the motion is denied on the basis of discriminatory credit terms, it is unnecessary to explore whether or not the warranty reimbursement program can be considered a component of price at this time.

7. Specifically, Whirlpool contends that UMCO's failure effectively to compete is a self-inflicted injury stemming from the inefficiencies of its two-tiered marketing system. Western Auto, by contrast, utilizes a direct marketing arrangement.

which are now the target of this motion for summary judgment.

Count I of UMCO's counterclaim, alleges that Whirlpool violated Puerto Rico's Law 75 by cutting off UMCO's credit without warning. Counts III & IV allege wrongful termination of UMCO's Venezuelan and Colombian distributorship respectively.

## A. UMCO's COUNTERCLAIM UNDER LAW 75

In Count I of its counterclaim in the Florida action, UMCO claims that Whirlpool's unilateral curtailment of UMCO's credit is in violation of Puerto Rico's law 75, which protects dealers against any acts of the principal that are "detrimental to the established relationship" of the parties. In support of its motion for summary judgment, Whirlpool maintains that its actions were merely an exercise of its rights under the Distributorship Agreement, and thus were consistent with, rather than detrimental to, the "established relationship" between the parties. Specifically, Section 8 of the Distributorship Agreement provides Whirlpool with the option of unilaterally determining the credit terms applicable to UMCO's purchases:

> Credit terms applicable to purchases from Whirlpool will be determined by Whirlpool's Credit Department in Benton Harbor, Michigan, U.S.A. You will pay Whirlpool for all products ordered by you from Whirlpool at the prices and upon the terms on which each such order is accepted by Whirlpool.

UMCO does not dispute Whirlpool's interpretation of the meaning of Section 8. Rather, UMCO grounds its claim in the appeal to a higher authority: Law 75, which (as previously noted in Section III–A, *supra*) provides that:

> Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew

said contract on its normal expiration, except for just cause.

10 L.P.R.A. Sec. 278a.

The "legislative intent [of Law 75] was to equalize the parties bargaining power and to balance the contractual conditions of two groups unequal in their strength.... The distributor was to be not only protected from arbitrary terminations, but also from *undue practices* on the part of principals or grantors." *General Office Products Corp. v. Gussco Manufacturing, Inc.,* 666 F.Supp. 328, 330 n. 4 (D.P.R.1987) (emphasis added) *See also Marina Industrial, Inc. v. Brown Boveri Corp.,* 114 D.P.R. 64, 85 (1984). In enacting and amending Law 75, the Puerto Rico legislature recognized that principals possessed the economic clout not only to eliminate dealers outright, but also "without fully eliminating them, ... to gradually reduce and impair the extent of their previously established relationships." House Commerce and Industry Committee Statement of Motives of Act No. 75. Law 75 was therefore drafted to protect dealers not only from termination but from practices short of termination which impaired the dealers' established relationships.

■ Thus, the fact that the integrated contract provided for Whirlpool's unilateral alteration of credit terms does not immunize exercise of this contractual provision from Law 75 scrutiny. UMCO claims that Whirlpool effectively terminated the UMCO/Whirlpool relationship by making it impossible for UMCO to place orders. If Whirlpool were allowed freely to terminate UMCO's credit simply because such a right were embodied in Clause 8 of the distributorship agreement, then Whirlpool could avoid the protection of Law 75 simply through the drastic manipulation of credit terms as UMCO alleges has happened in the case at bar. Were Whirlpool correct, principals would be free to employ their superior bargaining position to engraft such unilateral powers as credit withdrawal into the dealer/supplier contracts, and then use these provisions to create such an unfavorable situation for the dealer as to force

termination. Such an interpretation would vitiate the stated protection of Law 75.

 By contrast, the requirement that principals exercise their contract rights in good faith consistent with their "established relationships" preserves both the policies of Law 75 and the parties' freedom of contract. Law 75 does not require that Whirlpool never change UMCO's credit terms; it only requires that any change be made in good faith consistent with their "established relationship." *Medina & Medina*, 858 F.2d at 822–23 (Law 75 leaves "principal and dealer free to change or bargain in good faith the prices and credit terms for the sale of the franchised product."). Law 75 simply supplements the contract law to the extent necessary to protect weaker dealers from the abusive employment of one-sided contract terms by economically superior principals.

In light of the above discussion, Whirlpool would only be entitled to summary judgment on Count I of the Florida Action were it to demonstrate as an undisputed matter of fact that it had altered the credit terms of the established UMCO/Whirlpool relationship in good faith. Such showing is not supported by the record before the Court. Whirlpool's motion for summary judgment on Count I of the Florida Action is therefore denied.

B. UMCO's VENEZUELAN AND CO-LOMBIAN DISTRIBUTORSHIP

Whirlpool's final motion for summary judgment is directed at UMCO's claim for lost profits that would have been generated under the Venezuela and Colombia distributorship had they not been terminated by Whirlpool. UMCO received notice from Whirlpool of the termination of these distributorships at the same time it received notice of the termination of its Puerto Rico distributorship. Whirlpool argues that the only profits to which UMCO may reasonably be entitled to, if any, are those profits which UMCO would have received during the course of the agreement, January 1, 1986 through December 31, 1986, and not beyond its expiration.

As suggested in Whirlpool's memorandum of law, and as indicated in the Section 21 of the Distributorship Agreements, the Agreements are to be interpreted under Michigan law. The memoranda filed on this issue, however, deal only fleetingly with the issue's interpretation under Michigan law. The Court therefore requests that the parties rebrief the issue with a focus on the law that should govern the Venezuela and Colombia Distributorship Agreements. As movant, Whirlpool shall submit its memorandum within twenty days from the date of this Order. Response and reply memoranda shall be filed in accordance with local rules.

DONE AND ORDERED.