MILLER BREWING COMPANY *vs.* ALCOHOLIC BEVERAGES
CONTROL COMMISSION.

No. 00-P-1935.

Suffolk. September 10, 2002. - December 19, 2002.

Present: LENK, KAPLAN, & MASON, JJ.

*Alcoholic Liquors,* Alcoholic Beverages Control Commission, Supplier, Price,
Certificate of compliance, License.

This court concluded that a beer manufacturer's extension of different credit
    terms to various wholesalers constituted price discrimination in violation
    of G. L. c. 138, § 25A, which from its inception has been firmly tethered
    to the goal of protecting the public through the strict regulation of the
    distribution and sale of alcoholic beverages; moreover, G. L. c. 138, § 25,
    which regulates the activities of licensees with respect to credit terms, is
    not the exclusive means for regulating credit terms, but must be read in
    conjunction with § 25A. [805-808]
Where a beer manufacturer holding a certificate of compliance under G. L.
    c. 138, § 18B, sold alcoholic beverages to a ship chandler licensed under
    G. L. c. 138, § 13, the manufacturer violated its obligations under § 18B
    to sell only to wholesalers duly licensed under G. L. c. 138, § 18.
    [808-811]

CIVIL ACTION commenced in the Superior Court Department on
March 2, 1999.

The case was heard by *Allan van Gestel,* J., on a motion for
judgment on the pleadings.

*Matthew A. Porter (Bernard J. Bonn III* with him) for the
plaintiff.

*Romeo G. Camba,* Assistant Attorney General, for the
defendant.

LENK, J. Miller Brewing Company (Miller) appeals a judg-
ment of the Superior Court affirming an order of the Alcoholic
Beverages Control Commission (commission) that suspended
for fourteen days Miller's certificate of compliance, issued
pursuant to G. L. c. 138, § 18B, to export and sell alcoholic

beverages to licensees in the Commonwealth. The commission's order followed its determination that, in violation of G. L. c. 138, § 25A, Miller had discriminated in the price of alcoholic beverages it sold to Massachusetts wholesalers, and, in violation of G. L. c. 138, § 2, had sold alcoholic beverages to a Massachusetts merchant lacking the necessary license under G. L. c. 138, § 18, to buy them.

The facts of record pertinent to each determined statutory violation are few and undisputed. Miller, a Wisconsin corporation with a beer brewery in North Carolina, holds a certificate of compliance issued by the commission pursuant to G. L. c. 138, § 18B.[1] As such, Miller is authorized to export or sell alcoholic beverages to those in Massachusetts duly licensed by the commission to import or buy them. Those in Massachusetts holding a wholesalers' and importers' license under § 18[2] may purchase alcoholic beverages from holders of certificates of

[1]Section 18B provides in pertinent part:

"The commission shall issue a certificate of compliance to a licensee having a place of business located, and a license granted, outside the commonwealth and whose license authorizes the exportation or sale of alcoholic beverages to licensees in this commonwealth; provided, that such certificate shall be issued upon the condition that the holder shall furnish from time to time as the commission may require, but in no event more often than once each month, information concerning all shipments or sales of alcoholic beverages made by him to licensees in this commonwealth, and that he comply with the provisions of this chapter and any rules or regulations made under authority contained therein which pertain to a licensee of the same class, type or character, doing business in this commonwealth under a license issued by the commission. The commission may suspend, cancel or revoke any certificate issued hereunder for a violation of the terms or conditions thereof. . . .

"No person who holds a certificate under this section shall hold or be granted a license under section eighteen."

[2]Section 18 provides in pertinent part:

"The commission may issue to any individual who is both a citizen and resident of the commonwealth, and to any ship chandler licensed under the provisions of section thirteen and to partnerships composed solely of such individuals, and to corporations organized under the laws of the commonwealth whereof all the directors are citizens of the United States and a majority thereof residents of the commonwealth, licenses as wholesalers and importers (1) to sell for resale to other licensees under this chapter alcoholic beverages manufactured by any manufacturer licensed under the provisions of section nineteen and to import alcoholic beverages into the commonwealth from holders of certificates issued under section eighteen B whose licensed

compliance under § 18B (§ 18B certificate holders) such as Miller, while those in Massachusetts holding retailers' licenses, such as a ship chandler's license under G. L. c. 138, § 13,[3] may not.

During November, 1996, Miller sold comparable alcoholic beverages to six Massachusetts wholesalers duly licensed under § 18. All six received credit terms from Miller; five were provided credit terms of net eleven days (i.e., eleven days within which to pay Miller in full) while one was provided net thirty days. The six wholesalers are not in competition with each other insofar as each distributes Miller products in an exclusive distribution territory in Massachusetts granted it by Miller.

On five separate occasions from August, 1995, through April, 1997, Miller sold alcoholic beverages to Klausen-Getsby Company, a ship chandler licensed under § 13 and located in Boston, pursuant to a written contract. Under the terms of that contract, alcoholic beverages sold by Miller to this ship chandler were shipped free on board (F.O.B.) from Miller's North Carolina brewery, where title passed to the ship chandler. The ship chandler transported the product into Massachusetts "for

premises are located in other states and foreign countries for sale to such licensees . . . .

"In order to ensure the necessary control of traffic in alcoholic beverages for the preservation of the public peace and order, the shipment of such beverages into the commonwealth, except as provided in this section, is hereby prohibited."

[3]Section 13 provides in pertinent part:

"The commission may also issue licenses to sell alcoholic beverages to the owner or operator of any vessel or shipping company carrying passengers and operating out of any port of the commonwealth. Sales of alcoholic beverages by licensees under this section shall be made only under such regulations as the commission may prescribe. . . . Retail sales by ship chandlers of all alcoholic beverages not to be drunk on the premises, may be authorized by the commission, provided, however, that such sales shall not be for purposes other than provisioning a vessel or shipping company using any port of the commonwealth."

Title 204 Code Mass. Regs. § 5.01 (1993) defines a ship chandler as "one whose primary business is providing supplies and equipment to ships." Ship chandlers licensed under G. L. c. 138, § 13, may only purchase alcoholic beverages from those validly licensed under G. L. c. 138, §§ 18, 19, 19B or 19C. 204 Code Mass. Regs. § 5.04 (1993). However, ship chandlers licensed under § 13 may themselves also obtain a § 18 wholesalers' and importers' license.

delivery to ships sailing from the port(s) of Boston, Massachusetts." The invoices for these transactions show cash on delivery net terms of payment effected by electronic funds transfers and "sold to" and "ship to" addresses of the ship chandler at its Boston location. The contract provided, inter alia, that all such sales "shall be for export, used at ships stores or for resale aboard ships after departure from the United States," and that the ship chandler "represents and warrants that it will not sell any such beer . . . for resale within the United States or Canada." The ship chandler did not hold a license under § 18, and was apparently later held accountable by the commission for the aforesaid proscribed purchases it made directly from Miller.

In view of the foregoing, the commission determined that Miller's extension of different credit terms to Massachusetts wholesalers licensed under § 18 constituted price discrimination in violation of G. L. c. 138, § 25A,[4] and that Miller's sales to the Boston ship chandler were in violation of G. L. c. 138, § 2,[5] insofar as not in compliance with Miller's obligations under § 18B. Miller protests that § 25A does not prohibit § 18B certificate holders such as itself from extending disparate credit terms to wholesalers licensed under § 18. As to its sales to the ship chandler, Miller maintains that the statutory scheme set forth in c. 138 has no application to a sale, consummated out-of-State, of alcoholic beverages that are to be sold for consumption, not in Massachusetts, but aboard ships at sea. Even if the statute does apply to such sales, Miller contends, it has no obligation under § 18B to assure that the ship chandler had all necessary licenses to buy Miller's goods.

---

[4]Section 25A provides in pertinent part:

"No licensee authorized under this chapter to sell alcoholic beverages to wholesalers or retailers shall —

"(a) Discriminate, directly or indirectly, in price, in discounts for time of payment or in discounts on quantity of merchandise sold, between one wholesaler and another wholesaler, or between one retailer and another retailer purchasing alcoholic beverages bearing the same brand or trade name and of like age and quality."

[5]Section 2 provides in pertinent part:

"No person shall manufacture, with intent to sell, sell or expose or keep for sale, store, transport, import or export alcoholic beverages or alcohol, except as authorized by this chapter . . . ."

We review the commission's decision pursuant to G. L. c. 30A, § 14(7), to determine whether, as Miller claims, it was based on errors or law, and whether the decision is supported by substantial evidence, i.e., "such evidence as a reasonable mind might accept as adequate to support the agency's conclusion." *Seagram Distillers Co.* v. *Alcoholic Bevs. Control Commn.*, 401 Mass. 713, 721 (1988). While in our review we give due deference to the agency's expertise, technical competence, specialized knowledge, and discretionary authority in administering the statute, see *ibid.*; *Van Munching Co.* v. *Alcoholic Bevs. Control Commn.*, 41 Mass. App. Ct. 308, 309-310 (1996), the ultimate responsibility for interpreting the applicable statutory language nonetheless remains with the courts. *M.H. Gordon & Son, Inc.* v. *Alcoholic Bevs. Control Commn.*, 371 Mass. 584, 588-589 (1976).

*Section 25A: price discrimination.* Miller claims that offering disparate credit terms to its wholesalers does not violate § 25A because such conduct does not constitute price discrimination. This is so, Miller contends, because § 25A does not mention credit terms; its plain language prohibits only discrimination in price and in discounts, and neither "price" nor "discount" encompasses the concept of credit terms. That the Legislature did not intend § 25A to include a prohibition against offering disparate credit terms, it argues, is only underscored by G. L. c. 138, § 25, the one section in c. 138 to deal with extensions of credit. Section 25[6] expressly exempts § 18B certificate holders such as Miller from the limitations it places on credit terms.

---

[6]Section 25 provides in pertinent part:

"It shall be unlawful for any licensee under this chapter to lend or borrow money, directly or indirectly, to or from any other licensee under this chapter. It shall be unlawful for any licensee under this chapter to receive or extend credit, directly or indirectly, for alcoholic beverages sold or delivered to any licensee engaged in the sale of alcoholic beverages except in the usual course of business and for a period of not more than sixty days . . . . Nothing in this chapter shall require any manufacturer, winegrower or wholesaler to extend credit to any licensee. The credit period shall be calculated from the date of the delivery of the alcoholic beverages to the purchaser to the date when the purchaser discharges in full the indebtedness for which the credit was extended. If any licensee does not discharge in full any such indebtedness within such sixty day period, the indebtedness shall be overdue and such

The commission maintains that the terms of credit that are extended to a buyer can reasonably be viewed as a component of the amount paid by the buyer and received by the seller. While acknowledging that no Massachusetts appellate decision is controlling on this point, it suggests both that the definition of price in *M.H. Gordon & Son, Inc.* v. *Alcoholic Bevs. Control Commn.*, 371 Mass. at 591 ("the actual amount paid to the supplier for goods furnished to the buyer"), does not preclude this view and that decisions construing Federal antitrust statutes may be instructive in this regard. We agree both that *M.H. Gordon & Son, Inc.* v. *Alcoholic Bevs. Control Commn., supra*, is not dispositive and that "[i]t is virtually self-evident that extending interest-free credit for a period of time is equivalent to giving a discount equal to the value of the use of the purchase price for that period of time. Thus, credit terms must be characterized as an inseparable part of the price." *Catalano, Inc.* v. *Target Sales, Inc.*, 446 U.S. 643, 648 (1980).

That credit terms may reasonably be viewed as a component of price is not, however, the end of the matter. Questions remain, first, as to whether the act of offering disparate credit terms, without more (i.e., irrespective of the magnitude or nature of such differences, the business factors considered in offering the terms, whether the same standards of credit worthiness were extended to all applicants, whether the applicants were in competition with each other, and whether there was impact upon competition), may itself constitute discrimination under § 25A; and, second, as to whether the Legislature intended § 25 to be the exclusive means of regulating extensions of credit.

As to the former, we appreciate that the six wholesalers were not competitors, at least vis-à-vis Miller products, and that the record is silent as to Miller's reasons for offering disparate

licensee shall be delinquent within the meaning of this section. . . .

"No licensee under this chapter shall sell or deliver, directly or indirectly, alcoholic beverages to a licensee whose name is posted on the delinquent list, except for payment in cash on or before delivery, and no licensee who is posted on the delinquent list shall purchase or accept delivery of any alcoholic beverages except for payment in cash on or before delivery. . . .

"A holder of a certificate of compliance under the provisions of section eighteen B shall not be construed to be a licensee within the commonwealth under the provisions of this section."

credit terms, what factors it considered, and what if any financial impact the different credit terms extended may have had. While such matters are of undoubted import in determining whether price discrimination in violation of Federal antitrust laws has occurred, see, e.g., *Craig* v. *Sun Oil Co.*, 515 F.2d 221, 224 (10th Cir. 1975), cert. denied, 429 U.S. 829 (1976); *Thomas J. Kline, Inc.* v. *Lorillard, Inc.*, 878 F.2d 791, 795-796 (4th Cir. 1989), cert. denied, 493 U.S. 1073 (1990); *Carlo C. Gelardi Corp.* v. *Miller Brewing Co.*, 502 F. Supp. 637, 646-648 (D.N.J. 1980); *Whirlpool Corp.* v. *U.M.C.O. Intl. Corp.*, 748 F. Supp. 1557, 1566 (S.D. Fla. 1990), we are not persuaded of their significance when determining whether price discrimination in violation of G. L. c. 138, § 25A, has occurred. When enacting § 25A in 1946, the Legislature made plain its purpose in the emergency preamble to the legislation:

> "Whereas, the practice of manufacturers and wholesalers in granting discounts, rebates, allowances, free goods and other inducements to favored licensees contributes to a disorderly distribution of alcoholic beverages; and

> "Whereas, the deferred operation of this act would delay the proper regulation thereunder of the alcoholic beverage industry and be contrary to the interests of temperance, therefore this act is hereby declared to be an emergency law necessary for the immediate preservation of the public convenience."

St. 1946, c. 304. From its inception, then, § 25A has been firmly tethered to the goal of protecting the public through the strict regulation of the distribution and sale of alcoholic beverages; it was not enacted as an antitrust measure. Given the articulated purpose of eliminating differential treatment of "favored licensees," § 25A can reasonably be construed as prohibiting even seemingly minor discrepancies in prices offered by suppliers licensed under § 18B to their wholesalers. The different credit terms offered by Miller to one of its six Massachusetts wholesalers fall within this category.

The remaining concern is whether the Legislature intended § 25 to be the exclusive means for regulating credit terms, such that, if so, credit terms must not be read into the term "price" as it appears in § 25A.

To be sure, § 25 regulates the activities of licensees with respect to credit terms and expressly exempts § 18B certificate holders from its purview. So, for example, a wholesaler-licensee under § 18, while not required to extend credit to any retailer licensed under G. L. c. 138, § 15, may extend credit if it wishes to do so, but only in the ordinary course of business and for no more than sixty days. It is by no means clear to us, however, that a wholesaler thus constrained by § 25 is nonetheless free to offer different credit terms to different retailers — e.g., sixty days for some, forty-five days for others, ten for yet others, etc. — without running afoul of § 25A. Otherwise put, we are not persuaded that § 25 and § 25A are mutually exclusive, that § 18B certificate holders such as Miller are, by virtue of their exemption from the strictures placed on credit terms by § 25, thereby also exempt from the prohibition on price discrimination set forth in § 25A, or that § 18B certificate holders are permitted to discriminate in the otherwise unrestricted credit terms they may offer to those to whom they are permitted to sell alcoholic beverages.

In view of the foregoing, we discern no basis for disturbing the commission's determination that Miller violated § 25A by offering one of its six wholesalers better credit terms than it did the other five.

*Sections 2 and 18B: sale to an unlicensed entity.* Miller contends that its sales to the Boston ship chandler are not within the scope of G. L. c. 138 because all such sales were consummated outside of Massachusetts and because the alcoholic beverages sold to the ship chandler were not to be consumed in Massachusetts. In Miller's view, the product was, in effect, just passing through Massachusetts on its way out to sea. To the extent that c. 138 is seen as applicable, however, Miller argues that it may not be held responsible in any event for the ship chandler's failure to procure the necessary licenses.

Miller's contentions are best scrutinized after recourse to certain fundamentals about how the market for alcoholic beverages in Massachusetts is regulated. The "[r]egulation of the liquor industry in Massachusetts is comprehensive and pervasive." *Cellarmaster Wines of Mass., Inc.* v. *Alcoholic Bevs. Control Commn.*, 27 Mass. App. Ct. 25, 27 (1989). "Mas-

sachusetts law requires that alcohol products sold in this State by manufacturers or suppliers be sold initially to licensed Massachusetts wholesalers. Those wholesalers in turn sell to retailers who sell to consumers. G. L. c. 138, §§ 12, 15, 18, 18B, 19." *Heublein, Inc.* v. *Capital Distrib. Co.*, 434 Mass. 698, 699 (2001).

> "Consumers may purchase alcoholic beverages to be drunk off the premises only from duly licensed retailers. [G. L.] c. 138, § 15 (1991). Package stores so licensed under the statute may, in turn, purchase alcoholic beverages for resale from only those wholesalers who are duly licensed pursuant to [s]ection 18 of the same chapter. . . . Moreover, wholesalers licensed under [s]ection 18 may sell alcoholic beverages only to licensed retailers, and may purchase such beverages only from manufacturers who are licensed under the statute or who are holders of a [c]ertificate of [c]ompliance issued by the Alcoholic Beverage[s] Control Commission. . . . This certificate allows out-of-[S]tate licensees to export alcoholic beverages to Massachusetts and sell such beverages to duly licensed wholesalers. [G. L.] c. 138, § 18B (1991). Under this tight regulatory scheme, consumers cannot purchase alcoholic beverages directly from wholesalers or manufacturers and, in turn, wholesalers and manufacturers cannot sell alcoholic beverages directly to consumers."

*Wine & Spirits Wholesalers of Massachusetts, Inc.* v. *Net Contents, Inc.*, 10 F. Supp. 2d 84, 85 (D. Mass. 1998).

Pursuant to this multi-tiered "tight regulatory scheme," the beer manufacturer Miller is an out-of-State licensee who may export and sell its product only to duly licensed Massachusetts wholesalers. It may not sell directly to Massachusetts retailers or consumers. The ship chandler, while eligible to hold a § 18 wholesalers' and importers' license, did not procure such a license and was licensed only as a retailer under § 13. The ship chandler, in other words, was not permitted by its limited license to buy directly from Miller, and Miller was not permitted by its § 18B certificate to sell directly to that ship chandler. Miller's contention that the subject sales somehow fall outside the purview of this comprehensive statutory framework

because, on the one hand, the sales were consummated out-of-State and, on the other, the product sold was intended for ultimate resale and consumption outside of Massachusetts aboard ships at sea, lands well wide of the mark.

The ship chandler is a retail merchant located and doing business in Boston; it is subject to the laws of the Commonwealth, including laws as to the distribution and sale of alcoholic beverages. The ship chandler sells its wares squarely within the Commonwealth insofar as it sells to those operating their vessels out of Massachusetts ports; to the extent that those wares are alcoholic beverages, the ship chandler may purchase and sell only as its license permits. That the product so purchased within Massachusetts may then be resold and consumed aboard those vessels at sea is immaterial to the matter before us.[7,8] In like manner, we think nothing turns on the fact that Miller's sales to the ship chandler were F.O.B. the North Carolina brewery, where title is said to have passed to the ship chandler. We see nothing of consequence in such a business arrangement, providing as it does for formal transfer of goods outside the Commonwealth.[9] Were it otherwise, the mere employment of logistics such as this — as easily employed in sales to wholesalers licensed under § 18 and retailers licensed under § 15 as to ship chandlers licensed under § 13 — would enable out-of-State § 18B certificate holders to sell alcoholic beverages to Massachusetts merchants free of Massachusetts regulation. It

[7]We think Miller's contention that the commission's decision was in conflict with the commerce clause of the United States Constitution is without merit. The applicable liquor control regulations concerning the importation into and sale of alcoholic beverages within Massachusetts are a proper exercise of the Commonwealth's police powers within its jurisdiction.

[8]The circumstances here are quite unlike those as to which the Attorney General opined in 1967, where the alcoholic beverages were imported through points of entry in Massachusetts, no sale was contemplated to any person in Massachusetts, and the product was destined for a recipient outside the Commonwealth. The Attorney General concluded that the non-Massachusetts recipient did not require a license under G. L. c. 138, § 18. Opinion of the Attorney General, Rep. A.G., Pub. Doc. No. 12, at 42-44 (1968).

[9]Notably, § 18 contemplates that licensees under that section will "import" from § 18B certificate holders, whose licensed premises are by definition located in other States. It is implicit in the concept of importation that the transfer of goods to the Massachusetts importer-wholesaler may occur outside of Massachusetts for transport to and sale within the Commonwealth.

would introduce a Trojan horse into the statutory scheme. We reject this, mindful that the statute has among its purposes "ensur[ing] the necessary control of traffic in alcoholic beverages for the preservation of the public peace and order." G. L. c. 138, § 18.

Finally, Miller argues that even if the statutory scheme is applicable, as we hold it is, Miller ought not be penalized for the ship chandler's failure to procure a proper license under § 18. Unlike *BAA Massachusetts, Inc.* v. *Alcoholic Bevs. Control Commn.,* 49 Mass. App. Ct. 839, 844-845 (2000), upon which Miller relies, where a § 18B certificate holder was held not to be liable for failing to determine whether its hired carrier held a permit under G. L. c. 138, § 22, because nothing in § 18B established such a duty, this case involves a situation as to which § 18B does impose a duty upon the certificate holder.

Section 18B provides that a certificate holder may sell or export alcoholic beverages only to licensees. Otherwise put, it may not sell to whomever it pleases and, accordingly, may not turn a blind eye to the matter but must instead ascertain that it is selling to duly licensed purchasers. The statutes and regulations governing ship chandlers are plain and readily available to those doing business with such merchants. Under the familiar multi-tiered regulatory framework, Miller was undoubtedly on notice that it could not make sales directly to Massachusetts retailers and that only a ship chandler licensed under § 18 could purchase directly from Miller. In the circumstances, we discern no error in the commission's determination that § 2 and § 18B prohibit Miller's sales to one who fails to hold the necessary license to purchase from it.

*Judgment affirmed.*