GANTS, C.J.
**507 In these cases, we review two decisions of the alcoholic beverages control commission (commission) that resulted in the issuance of penalties against Craft Beer Guild, LLC (Craft), a licensed wholesaler of craft beers doing business as Craft Brewers Guild, and Rebel Restaurants, Inc. (Rebel), a licensed retailer doing business as Jerry Remy's, which purchased kegs of craft beer from Craft for sale to its bar and restaurant customers. After an investigation and evidentiary hearings, the commission determined that Craft had paid monetary rebates in differing amounts on craft beer purchases to certain licensed retailers in violation of G. L. c. 138, § 25A (a ), which prohibits licensed wholesalers from discriminating, directly or indirectly, in price among retailers that purchase the same alcoholic beverage. The commission also concluded that both Craft and Rebel violated *680 a regulation prohibiting **508 a particular scheme of commercial bribery, 204 Code Mass. Regs. § 2.08 (1993), which provides that "[n]o licensee shall give or permit to be given money or any other thing of substantial value in any effort to induce any person to persuade or influence any other person to purchase ... any particular brand or kind of alcoholic beverages" -- the validity of which Craft and Rebel both challenge. Craft and Rebel each sought judicial review of the commission's decisions; one Superior Court judge affirmed the commission's penalty against Craft, and another judge affirmed the penalty against Rebel.
We affirm the judgment against Craft, concluding that the commission properly determined that Craft violated both the statute and the regulation, and that the regulation remains valid. But because we conclude that the terms of the regulation do not apply to Rebel's conduct in accepting money derived from kickbacks paid by Craft, we reverse the judgment against Rebel.[3]
Background. Craft is a Massachusetts-based wholesaler and distributor of craft beer, licensed by the commission pursuant to G. L. c. 138, § 18. Craft distributes approximately 200 craft beer brands to its retail customers, which are restaurants and bars licensed under G. L. c. 138, § 12. In October 2014, an owner of a Massachusetts-based beer supplier -- and one of the products distributed by Craft -- posted comments to his Twitter social media webpage, alleging that competing suppliers were making unlawful payments to Massachusetts retailers in exchange for those retailers carrying their Craft-distributed brand. As a result of those complaints, the commission initiated an investigation into Craft's practices in accordance with its mandate of "general supervision of the conduct of the business of ... selling alcoholic beverages." G. L. c. 10, § 71.
In April 2015, the commission investigators released an eighteen-page violation report setting forth the results of the investigation. After receipt of the report, the commission issued notices of hearing, alleging violations by Craft of the statute ( G. L. c. 138, § 25A [a ] ) and the regulation ( 204 Code Mass. Regs. § 2.08 ). The commission also issued notices of hearing to Rebel and other restaurant groups involved in the investigation of Craft, alleging violation of the regulation, but deferred hearing on these notices until it rendered its decision as to Craft. After a hearing, where **509 Craft stipulated to the facts in the violation report, the commission in February 2016 issued a written decision finding Craft in violation of the statute and regulation as charged. In June 2016, the commission conducted a hearing regarding the alleged violations by Rebel, and in December 2016, it issued a written decision finding Rebel in violation of the regulation.
We summarize the facts as found by the commission, which are largely not in dispute but, in any event, which we find to be supported by substantial evidence. See G. L. c. 30A, § 14 (7) (e ) (court may set aside agency decision if "[u]nsupported by substantial evidence"). See also Vaspourakan, Ltd. v. Alcoholic Beverages Control Comm'n, 401 Mass. 347, 351, 516 N.E.2d 1153 (1987) ("we do not make a de novo determination of the facts or draw different inferences from the facts found by the agency").
Beginning in 2013, Craft "negotiated and implemented a series of kickback schemes" with various craft beer manufacturers and importers (suppliers), various bars and *681 restaurants (retailers), and various management or marketing companies that "have the exact same or common group of corporate officers and beneficial interest holders as the [r]etailers," but do not themselves hold alcoholic beverages licenses (third parties).[4] One of those retailers was Rebel, whose associated management or marketing company **510 was Rebel Restaurant Group, Inc. (Rebel Marketing).
Through this scheme, Craft negotiated payments to third parties -- unlicensed management or marketing companies -- in exchange for their associated § 12 retailers selling Craft products at their bars and restaurants. Craft typically paid either $ 1,000 to $ 2,000 annually for each committed tap line serving a Craft brand, or fifteen to twenty dollars in "rebates" for each keg of beer sold. As a way of disguising these payments, Craft never paid the licensed retailers directly. Instead, the third-party company -- rather than the licensed retailer -- invoiced Craft for services never actually performed, such as for "marketing support," "printing of menus," and "promotional services." After paying the fee, Craft required the supplier of the beer brand to fully or partially reimburse Craft for the kickbacks paid to the third party. Craft did not publicly disclose that it was making these "rebate" payments, and it did not make them available to all licensed retailers.
Craft paid Rebel Marketing a twenty dollar "rebate" per keg sold in exchange for carrying Craft brands, for a total of $ 8,420, which Rebel Marketing passed through to Rebel. Although the commission extensively detailed Craft's dealings with other retailers and third-party management and marketing companies, only Rebel was charged with violating 204 Code Mass. Regs. § 2.08, because the commission found no evidence that money paid from Craft to other third parties was actually received by any other retailers.
The commission concluded that Craft committed price discrimination in violation of G. L. c. 138, § 25A (a ), because it (1) did not offer rebates to all retailers and (2) did not offer the same rebate amounts to the retailers to which it paid rebates. The commission also concluded that Craft violated 204 Code Mass. Regs. § 2.08 because of its participation in a three-person scheme wherein a licensee gave money to another person to induce a third person to purchase *682 a particular brand of Craft-distributed beer.[5] In so doing, the commission rejected Craft's arguments that § 2.08 **511 had been impliedly repealed, was void for vagueness, or was being selectively enforced. In accordance with its authority under G. L. c. 138, § 23, to revoke licenses "for any violation of this chapter or any regulation adopted by the commission," the commission suspended Craft's license for a period of fifteen months, with ninety days to be served and the remaining suspension to be held in abeyance for two years conditioned on no further violations of G. L. c. 138 or commission regulations. After Craft submitted an offer of compromise and the commission accepted, Craft elected instead to pay a fine of $ 2,623,466.70 in lieu of the suspension, which amount was calculated under the formula set forth in G. L. c. 138, § 23.
As to Rebel, the commission determined that Rebel was in violation of § 2.08 because Rebel "permitted Craft to give it [twenty dollars] per keg of Craft brands [that Rebel] sold on its licensed premises." In so doing, the commission rejected the same arguments as to the validity of the regulation as it did against Craft, and additionally proclaimed that the regulation "applies to inducements received by retailers" (emphasis added). The commission imposed a penalty of an eighteen-day suspension of Rebel's license, with three days to be served and the remaining balance to be held in abeyance for two years conditioned on no further violations of G. L. c. 138 or commission regulations.[6]
Craft and Rebel, in separate cases, sought judicial review in the Superior Court pursuant to G. L. c. 30A, § 14. All parties filed motions for judgment on the pleadings, and the judges each granted the commission's motion to approve enforcement of its decisions. Craft and Rebel timely appealed, and we granted their applications for direct appellate review.
Discussion. A final agency decision may be set aside or modified on judicial review under G. L. c. 30A, § 14, where, among other reasons, it is "[i]n violation of constitutional provisions," under § 14 (7) (a ) ; is "[b]ased upon an error of law," under § 14 (7) (c ) ; or is "arbitrary or capricious, an abuse of discretion, or otherwise **512 not in accordance with law," under § 14 (7) (g ). See Police Dep't of Boston v. Kavaleski, 463 Mass. 680, 689, 978 N.E.2d 55 (2012). In reviewing an agency decision, we exercise de novo review on questions of law, giving "substantial deference to a reasonable interpretation of a statute by the administrative agency charged with its ... enforcement." Commerce Ins. Co. v. Commissioner of Ins., 447 Mass. 478, 481, 852 N.E.2d 1061 (2006). We also give "due weight to the *683 commission's experience, technical competence and specialized knowledge, as well as to the discretionary authority conferred upon it." Van Munching Co. v. Alcoholic Beverages Control Comm'n, 41 Mass. App. Ct. 308, 309-310, 670 N.E.2d 401 (1996). But deference does not suggest abdication; "[a]n incorrect interpretation of a statute ... is not entitled to deference." Commerce Ins. Co., supra, quoting Kszepka's Case, 408 Mass. 843, 847, 563 N.E.2d 1357 (1990).
Before we address the specific challenges raised by Craft and Rebel to the agency decisions, we discuss the evolution of the statutory and regulatory framework governing the distribution and sale of alcoholic beverages in order to give historical context to the enactment and subsequent amendment of G. L. c. 138, § 25A (a ), and to the promulgation of 204 Code Mass. Regs. § 2.08.
1. Evolution of the statutory and regulatory framework governing the distribution and sale of alcoholic beverages. The ratification of the Twenty-first Amendment to the United States Constitution on December 5, 1933, brought an end to the nationwide prohibition on the manufacture, sale, and transportation of intoxicating liquors. See United States v. Chambers, 291 U.S. 217, 222, 54 S.Ct. 434, 78 L.Ed. 763 (1934). The Amendment conferred upon the individual States "the broad powers ... to regulate the sale of liquor." Cabaret Enters., Inc. v. Alcoholic Beverages Control Comm'n, 393 Mass. 13, 16, 468 N.E.2d 612 (1984), citing New York State Liquor Auth. v. Bellanca, 452 U.S. 714, 717-718, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981).
In anticipation of ratification, the Legislature in July 1933 established a joint special recess committee (committee) to issue a report "determining upon appropriate means and methods of regulating and controlling the manufacture, transportation, importation, exportation and sale of intoxicating liquors." Report of the Special Committee on Liquor Legislation, 1933 Senate Doc. No. 494, at 4 (Report of the Special Committee). In the committee's report and recommendations to the Legislature, submitted in November 1933, it identified as its chief goals in developing **513 new laws and regulations governing alcoholic beverages that "those conditions which lead to intemperance are properly regulated, the illicit traffic in liquor and allied criminal activities made impossible of continuance, [and] the prompt return of a wholesome regard for law [is] assured." Id. at 6. In reaching its conclusions, the committee extensively studied the regulatory systems in place in foreign jurisdictions, as well as recommendations from a separate committee appointed by the Governor. Id. at 6-7.
The committee called for the creation of the commission and suggested that it have "absolute control ... over conditions of sale," in order to "obviate the dangerous possibility of politics entering" the business of selling alcoholic beverages. Id. at 9. To that end, the committee recommended that, in the forthcoming legislation that was to become the Liquor Control Act, the commission have "blanket authority to make rules and regulations not inconsistent with the provisions of the [legislation]." Id. at 13. The committee also sought to strictly limit the number of licenses issued by the commission - - as to "all branches of the liquor traffic," including both retailers and wholesalers -- in order to ensure "closer and safer control" over the industry. Id. at 9, 12, 15.
Importantly, the committee warned against inviting the corruption that had been widespread in the alcoholic beverages industry before the Prohibition era, particularly "[t]he control of the retail liquor business by breweries or other manufacturers." Id. at 16. Fearing that the industry *684 would be subject to a takeover of control by manufacturers and suppliers, the committee recommended that beer manufacturers not be permitted to "lend money to any licensee[s]." Id.
In response to the committee's report, the Legislature took action consistent with the committee's recommendations. See Connolly v. Alcoholic Beverages Control Comm'n, 334 Mass. 613, 617 n.1, 138 N.E.2d 131 (1956) ("the report of the special recess committee ... was the basis of most of ... G. L. c. 138"). In a special legislative session that ended in December 1933, the Legislature enacted the legislation that created the commission, originally established by G. L. (Ter. Ed.) c. 6, § 43, inserted by St. 1933, c. 120, § 2, see Pettengell v. Alcoholic Beverages Control Comm'n, 295 Mass. 473, 474-475, 4 N.E.2d 324 (1936),[7] and also enacted the Liquor Control Act, **514 G. L. (Ter. Ed.) c. 138, as appearing in St. 1933, c. 376, § 2, see Pettengell, supra, which generally governs the distribution and sale of alcoholic beverages in the Commonwealth. The commission is tasked with "general supervision of the conduct of the business of manufacturing, importing, exporting, storing, transporting and selling alcoholic beverages." G. L. c. 10, § 71. Among other things, the Liquor Control Act authorizes the commission to "make regulations not inconsistent with the provisions of this chapter for clarifying, carrying out, enforcing and preventing violation of ... all and any of its provisions ... for the proper and orderly conduct of the licensed business." G. L. c. 138, § 24.
Among the purposes of the Liquor Control Act was to "counteract the tendency toward" the evil of "tied houses," Seagram Distillers Co. v. Alcoholic Beverages Control Comm'n, 401 Mass. 713, 716, 519 N.E.2d 276 (1988) -- that is, the "reciprocal relationship[s] between saloon owners and manufacturers of alcoholic beverages that existed before Prohibition." Grubb, Exorcising the Ghosts of the Past: An Exploration of Alcoholic Beverage Regulation in Oklahoma, 37 Okla. City U. L. Rev. 289, 298 (2012). "Tied house" practices "referred to large manufacturers and distillers able to control the entire distribution process from production down to the neighborhood bar." Eng, Old Whine in a New Battle: Pragmatic Approaches to Balancing the Twenty-first Amendment, the Dormant Commerce Clause, and the Direct Shipping of Wine, 30 Fordham Urb. L.J. 1849, 1863 (2003). Typically, manufacturers of alcoholic beverages "provided incentives to saloon owners in exchange for payment or a pledge by the owner to sell the manufacturer's products," which transformed independent retailers into mere " 'agents' of the liquor producers who supplied them." Grubb, supra. This exercise of the economic power of the supplier to dominate the wholesale and retail tiers of the industry undermined both the independence of wholesalers and the protection of small retailers. See Opinion of the Justices, 368 Mass. 857, 862, 333 N.E.2d 414 (1975). See also National Distrib. Co. v. United States Treasury Dep't, Bureau of Alcohol, Tobacco & Firearms, 626 F.2d 997, 1008 (D.C. Cir. 1980) (practices which "tended to produce monopolistic control of retail outlets" included "arrangements for exclusive outlets, creation of tied houses, commercial bribery, and sales on consignment" [citation omitted] ).
The "tied house" was thought to lead to a variety of social ills.
**515 In 1935, the chair of the newly created Federal Alcohol Administration *685 opined that "[b]efore prohibition, a vast number of the retail outlets of the country where liquor was sold for consumption on the premises had fallen into the hands of the distillers and the brewers. ... That inevitably threw them into politics, inevitably led them to seek control of State and municipal legislation, and ... was one of the first causes of prohibition" (citation omitted). National Distrib. Co., 626 F.2d at 1009. Another common view was that the "tied house" led to the increased consumption of alcohol, because distillers and brewers frequently required retailers to sell a certain quota as a condition of carrying a particular brand. See ids="651555,3505932" index="30" url="https://cite.case.law/f2d/626/997/">id. See also Affiliated Distillers Brands Co. v. Sills, 56 N.J. 251, 258, 265 A.2d 809 (1970) ("tied-houses inevitably result in excessive sales stimulation at the retail level, creating a direct conflict with the promotion of temperance"). By enacting a legislative scheme that segregated the three tiers of licensees -- manufacturers/suppliers, wholesalers, and retailers -- and gave the commission strict regulatory oversight, the Legislature sought to encourage temperance and combat the risk that the multiple branches of liquor traffic would become muddled due to collusion and corruption. See Opinion of the Justices, 368 Mass. at 862, 333 N.E.2d 414. See also de Ganahl, Trade Practice and Price Control in the Alcoholic Beverage Industry, 7 Law & Contemp. Probs. 665, 669 (1940) (noting that commission ordered ban on brewers "loaning signs to retail licensees" because "[o]ne of the basic principles underlying the provisions of the [L]iquor [C]ontrol [A]ct is that there shall be a complete disassociation between brewers and retail licensees"); Grubb, supra at 299 ("several states devised regulatory schemes aimed at preventing" tied houses and excessive consumption by prohibiting suppliers from "giv[ing] 'a thing of value' to a retailer" [citation omitted] ).
In 1935, in accordance with its legislative mandate, the commission promulgated a panoply of regulations governing the new business of manufacturing, distributing, and selling alcoholic beverages in the Commonwealth. Among those regulations was Regulation 47, which stated:
"No licensee shall give or permit to be given money or any other thing of substantial value in any effort to induce any person to persuade or influence any other person to purchase, or contract for the purchase of any particular brand or kind of alcoholic beverages, or to persuade or influence any person **516 to refrain from purchasing, or contracting for the purchase of any particular brand or kind of alcoholic beverages."
In 1946, prompted by a petition from the Massachusetts Package Stores Association, the Legislature enacted G. L. c. 138, § 25A, inserted by St. 1946, c. 304, titled, "An Act prohibiting discrimination between licensees of alcoholic beverages by eliminating the practice of manufacturers and wholesalers in granting discounts, rebates, allowances, free goods and other inducements to favored licensees." The statute as originally enacted stated in part as follows:
"It shall be unlawful for any licensee authorized under this chapter to sell alcoholic beverages to wholesalers or retailers:
"(a ) To discriminate, directly or indirectly, in price, in discounts for time of payment or in discounts on quantity or merchandise sold, between one wholesaler and another wholesaler, or between one retailer and another retailer purchasing alcoholic beverages bearing the same brand or trade name and of like age and quality.
"(b ) To grant, directly or indirectly, any discount, rebate, free goods, allowance *686 or other inducement, except a discount not in excess of two per centum for quantity of alcoholic beverages except wines, or a discount not in excess of five per centum for quantity of wines."
In the preamble to § 25A, the Legislature noted that the practice of manufacturers and wholesalers granting such discounts, rebates, and inducements "contributes to a disorderly distribution of alcoholic beverages." See Miller Brewing Co. v. Alcoholic Beverages Control Comm'n, 56 Mass. App. Ct. 801, 807, 780 N.E.2d 80 (2002) ("From its inception, ... § 25A has been firmly tethered to the goal of protecting the public through the strict regulation of the distribution and sale of alcoholic beverages").
In 1970, the Legislature repealed the provision quoted above in G. L. c. 138, § 25A (b ), repealed by St. 1970, c. 140, § 1, which limited the size of discounts a wholesaler may offer to all retailers.[8] No changes were made to § 25A (a ), which prohibits a wholesaler from discriminating in price among different retailers. The result of the repeal is that the statute, as it stands today, permits **517 authorized licensees to grant discounts in alcoholic beverage sales, but only "block discounts" that apply evenly to all retailers.
In 1978, the commission codified its administrative regulations in the Code of Massachusetts Regulations. Regulation 47, left unchanged, was promulgated as 204 Code Mass. Regs. § 2.08, and continues to prohibit inducements within the context of a three-person scheme.
2. Statutory violations as charged against Craft. We begin our analysis by assessing the commission's decision against Craft with respect to the charged violation of G. L. c. 138, § 25A (a ). The commission found that Craft violated the statute in two separate ways. First, Craft engaged in price discrimination by offering rebates to at least six distinct retail licensees or their affiliated third-party management or marketing companies, but not offering rebates to other retailers with which it did business. Second, the rebates that Craft did offer varied significantly in price: Rebel received twenty dollars per keg, while another restaurant group received fifteen dollars per keg; one group of licensees received $ 1,000 per dedicated tap line, another received $ 1,500, and yet another received $ 2,000. Craft concedes that it engaged in this conduct, but argues, for various reasons, that the commission failed to find sufficient facts that its conduct constituted a violation of § 25A (a ). We are not persuaded.
Craft correctly posits that, in order to establish a prima facie violation of § 25A (a ), the commission must establish that (1) a licensee (2) discriminated (directly or indirectly) (3) in price, in discounts of payment, or in discounts on quantity of merchandise sold (4) between one licensed *687 retailer and another licensed retailer that were purchasing alcoholic beverages (5) that bore the **518 same brand or trade name and (6) were of like age and quality. But Craft suggests that the commission failed to find "simultaneous sales of the same products at different prices," reading another requirement into the statutory framework: contemporaneousness. We agree that, where price discrimination is alleged, the sales that demonstrate price discrimination should generally be contemporaneous "to eliminate the possibility that their differences are caused by market fluctuations ordinarily happening during an extended time interval between sales." Rutledge v. Electric Hose & Rubber Co., 327 F.Supp. 1267, 1275 (C.D. Cal. 1971). But in this case, substantial evidence supported the commission's conclusions that Craft did discriminate in price as to the same brands during the same time frame. The commission's violation report -- the facts of which Craft stipulated to in writing -- reveals that, for example, in invoices from July 2014, Craft granted rebates to numerous retailers for the same brands of beer at differing rates of fifteen and twenty dollars per keg. At least one of these invoices indicated a reporting period of January 1, 2014, through June 30, 2014, with consistently applied twenty dollar rebates throughout that period. Further evidence shows that Craft was paying the same "tap line" rebates on an annual basis, year after year, effectively ruling out the possibility that the differing rebate rates found by the commission were the result of changed prices. Because, "given the articulated purpose of eliminating differential treatment of 'favored licensees,' § 25A can be construed as prohibiting even seemingly minor discrepancies in prices," Miller Brewing Co., 56 Mass. App. Ct. at 807, 780 N.E.2d 80, we cannot say that the commission lacked sufficient facts to find Craft in violation of the statute.
Craft also contends that, because the commission only found evidence that Craft paid the rebates to third-party marketing and management companies, not to the retailers themselves -- with the exception of Rebel, which was found to have accepted those rebates -- Craft contends that it did not unlawfully discriminate against "retail licensees." In other words, because Craft was only found to have paid one § 12 retailer, discrimination "between one retailer and another retailer" was legally impossible. The flaw in this argument is that the unlicensed third parties had the exact same or a common group of corporate officers and beneficial interest holders as the licensed retailers. If we were to adopt Craft's argument, a wholesaler could engage in price discrimination so long as it simply paid the rebates to a corporate parent or **519 any affiliated entity of a licensed retailer. But by expressly prohibiting "direct[ ] or indirect[ ]" price discrimination to particular favored licensees, the Legislature demonstrated its intent to forbid any attempt to execute this type of end run around the statute. See Mullally v. Waste Mgt. of Mass., Inc., 452 Mass. 526, 531, 895 N.E.2d 1277 (2008) (statutory construction must not "frustrate the general beneficial purposes of the legislation" [citation omitted] ). Moreover, the record reflects that the third parties sought to conceal the true purpose of the rebates by invoicing Craft for false "services," such as "marketing support," and that those payments were sometimes made by Craft employees hand-delivering checks to the retailers' premises. This evidence more than adequately supports the commission's finding that Craft discriminated in price as to its actual licensed retail customers, even if it did not do so directly.
Lastly, Craft asserts that it did not discriminate in price because it "is only accused of giving rebates and not of changing *688 the front-line price paid by retailers." Prices under the statute, however, are calculated after appropriate reductions are made "to reflect all discounts, rebates, and other allowances given to the purchasers." M. H. Gordon & Son, Inc. v. Alcoholic Beverages Control Comm'n, 371 Mass. 584, 591, 358 N.E.2d 778 (1976). See G. L. c. 138, § 25D (d ) (describing how to calculate price of alcoholic beverages sold in other States). See also A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396, 1407 (7th Cir. 1989), cert. denied, 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990) ("Whether price discrimination has occurred depends ... on the price after all discounts, specials, and so on" [emphasis in original] ). It is simply irrelevant that the retailers here paid the same price for the same goods before discounts or rebates, where the actual price after discounts or rebates differed.
Because the commission's determination that Craft violated G. L. c. 138, § 25A (a ), is supported by substantial evidence and is free from legal error, we decline to disturb that part of its decision.
3. Regulatory violations as charged against Craft and Rebel. a. Validity of the regulation. As discussed above, both Craft and Rebel were found in violation of 204 Code Mass. Regs. § 2.08 -- and penalized accordingly -- for their participation in an inducement scheme among beer suppliers, Craft, Rebel Marketing, and Rebel. Craft and Rebel both argue that § 2.08 is no longer valid following the repeal of G. L. c. 138, § 25A (b ) -- the Liquor **520 Control Act's ban on the granting of discounts and inducements. They contend that, without § 25A (b ), the commission has no legislative authority to continue to enforce its regulation prohibiting a licensee from giving money to a person to induce that person to persuade another person to purchase a particular brand of alcoholic beverage. In response, the commission argues that the repeal unambiguously means that it can no longer prohibit uniform discounts, but the repeal was not intended to "permit licensees to secretly pay bribes or kickbacks to bar managers or management companies in an effort to have those people influence § 12 retailers to purchase particular kinds of alcohol." We conclude that the commission has the better argument.
"Duly promulgated regulations of an administrative agency are presumptively valid and 'must be accorded all the deference due to a statute.' " Pepin v. Division of Fisheries & Wildlife, 467 Mass. 210, 221, 4 N.E.3d 875 (2014), quoting Massachusetts Fed'n of Teachers, AFT, AFL-CIO v. Board of Educ., 436 Mass. 763, 771, 767 N.E.2d 549 (2002). The burden of demonstrating invalidity rests squarely on the party challenging the regulation. Pepin, supra.
In determining whether an administrative agency's regulation is valid, we apply a two-step test. First, we determine whether the Legislature, through the enactment of a statute, "has spoken with certainty on the topic" in the regulation. Taylor v. Housing Appeals Comm., 451 Mass. 149, 153-154, 883 N.E.2d 1222 (2008), quoting Goldberg v. Board of Health of Granby, 444 Mass. 627, 632-633, 830 N.E.2d 207 (2005). If it has done so unambiguously, we "give effect to the Legislature's intent," Taylor, supra at 154, 883 N.E.2d 1222, quoting Goldberg, supra at 633, 830 N.E.2d 207, and need not reach the second step.
If the statute relevant to the regulation is ambiguous or if there is a gap in the statutory guidance, we turn to the second step and "determine whether the agency's resolution of [the pertinent] issue may 'be reconciled with the governing legislation.' "
*689 Taylor, supra, quoting Goldberg, supra at 633, 830 N.E.2d 207. In doing so, we accord "substantial deference" to the agency charged with interpreting and administering the statute in question, and do not invalidate regulations unless "their provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." Taylor, supra, quoting Goldberg, supra. See Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Siting Bd., 457 Mass. 663, 681, 932 N.E.2d 787 (2010) ("We accord substantial discretion to an agency to interpret the statute it is charged with enforcing, especially where ... the Legislature has authorized the agency to promulgate regulations").
**521 Applying that two-part test, we note that there is no statutory provision that unambiguously speaks to the prohibition in 204 Code Mass. Regs. § 2.08, so we must move to the second step and determine whether the regulation may be reconciled with the governing legislation, the Liquor Control Act. As earlier noted, the commission promulgated the regulation in 1935 as Regulation 47, well before the enactment of § 25A (b ), pursuant to the commission's legislative mandate to "make regulations not inconsistent with the provisions of this chapter for clarifying, carrying out, enforcing and preventing violation of ... all and any of its provisions ... for the proper and orderly conduct of the licensed business." G. L. c. 138, § 24. The regulation's prohibition against commercial bribery -- the payment by a licensed beer manufacturer or wholesaler to a third person, perhaps a bartender or bar manager, to induce that person to persuade or influence the bar owner to purchase a particular brand of beer -- is well within the over-all legislative purpose of the Liquor Control Act to maintain fair competition in the industry. The regulation addresses one scheme to create "tied houses" that would effectively block certain beer brands from being sold in bars and restaurants for reasons unrelated to their price or quality. Indeed, the evil of commercial bribery strikes at the core of the Legislature's purpose in enacting the Liquor Control Act, because commission oversight of the industry is made more difficult where business is conducted covertly and in secret.[9]
In light of this history, we conclude that the repeal of § 25A (b ) renders § 2.08 no less consistent with the over-all legislative scheme of the Liquor Control Act. The purpose of § 25A, as titled, was to prohibit special treatment toward "favored licensees." In repealing § 25A (b ), the Legislature sought to allow volume discounts as applied to all retailers, but left intact the provision of the statute barring price discrimination as to different retailers. By prohibiting clandestine payments to third persons to persuade retailers to carry favored brands of alcoholic beverages, the commission continued to safeguard against such discrimination by regulating bribery and "pay-to-play" schemes that benefited some to the detriment of others. The commission's attempt to regulate such conduct through § 2.08 (the renamed Regulation 47) cannot be said to be inconsistent with that legislative scheme, **522 either before or after the repeal of § 25A (b ).
We think it worth noting that the same year that Regulation 47 was promulgated, Congress enacted the Federal Alcohol Administration Act, which contained a provision prohibiting commercial bribery from sellers to retailers via employees or *690 agents. 27 U.S.C. § 205(c).[10] The Federal Trade Commission applied the statute "to the practice of sellers of secretly paying money or making gifts to employees or agents to induce them to promote purchases by their own employers from the sellers offering the secret inducements." American Distilling Co. v. Wisconsin Liquor Co., 104 F.2d 582, 585 (7th Cir. 1939). As the United States Court of Appeals for the Seventh Circuit concluded, the principal "vice" of such conduct against which Congress sought to guard related to unfair competition and trade practices. Id. This finding squarely comports with our own Legislature's concerns that the consumer not be injured by the "control of the retail liquor business by breweries or other manufacturers." Report of the Special Committee, supra at 16. By promulgating § 2.08, the commission, not unlike Congress in enacting 27 U.S.C. § 205(c), sought to avoid "secret and corrupt dealing with employees or agents of prospective purchasers." American Distilling Co., supra.
In sum, because 204 Code Mass. Regs. § 2.08 can be read harmoniously **523 with the legislative mandate underlying G. L. c. 138, it remains valid despite the repeal of § 25A (b ).
b. Regulatory violations -- Craft. Apart from challenging the validity of the regulation, Craft challenges the commission's ruling on two other grounds: first, that the decision "conflicted with subsequent holdings based on the same facts and was thus arbitrary and capricious"; and, second, that the commission violated Craft's due process rights by improperly relying on evidence from outside the hearing record. We address these arguments in turn.
As to the first argument, Craft claims that because it was found in violation of 204 Code Mass. Regs. § 2.08 as to a number of different retailers, but the commission found insufficient evidence that all of those retailers -- except for Rebel -- violated § 2.08 under the same set of facts, the commission "contradict[ed] an earlier interim determination made on the same record." Retirement Bd. of Somerville v. Contributory Retirement Appeal Bd., 38 Mass. App. Ct. 673, 677-678, 651 N.E.2d 1241 (1995). Specifically, in a 2016 decision as to one § 12 retailer, the commission determined that its affiliated third-party management company received $ 20,000 from Craft in bribes for twenty dedicated tap lines at its restaurants, but there was no evidence that the particular § 12 retailer itself was "permit[ted] to be given" money in violation of § 2.08 ; the licensed retailer was therefore not found to have *691 violated the regulation. Indeed, Rebel was the only § 12 retailer in the entire "scheme" involving Craft to have been found in violation of the regulation, because it was the only licensed retailer shown to have been "given money." Craft contends that it cannot be held responsible for the inducements targeted at the other retailers because "an essential element of § 2.08 is that a retail licensee permits to be given something of value" (quotation, citation, and alterations omitted), and every retailer but Rebel did not.[11]
Craft's argument reflects a misreading of the plain terms of § 2.08. The regulation prohibits a licensee from "giv[ing] or permit[ting] to be given money ... to induce any person to persuade or any influence any other person to purchase ... any particular brand or kind of alcoholic beverages." In the case against Craft, Craft-- not a § 12 retailer -- is the licensee whose conduct was at issue; none of the other persons referenced in the regulation **524 need be a licensee. Specifically, the person given the money need not be a licensee for the licensee who is giving the money to be in violation of the regulation. Where the commission determined that Craft gave money to induce third-party management and marketing companies to persuade § 12 retailers to purchase Craft brand beers, Craft was in violation of the regulation regardless of whether any of the money it paid was actually given to the § 12 retailers. Because, as to the § 2.08 charge against Craft, it is irrelevant whether the retailers that were the target of Craft's inducements ultimately received any money, the commission's decisions as to the other retailers involved in these cases are not inconsistent with the decision against Craft. For that reason, we conclude that the commission's decision against Craft was not arbitrary or capricious.
Craft's second argument rests on due process grounds. Craft contends that, because the commission took administrative notice of its own internal documents after the hearing to establish the common ownership of several retailers and their third-party management or marketing companies, Craft was deprived of the opportunity to challenge this evidence.[12] We agree with Craft that facts that an agency relies upon in reaching its decision must be established by the record, Arthurs v. Board of Registration in Med., 383 Mass. 299, 310, 418 N.E.2d 1236 (1981), and that the parties should be afforded an opportunity to respond to administratively noticed material. See Kavaleski, 463 Mass. at 690, 978 N.E.2d 55. But a party seeking to set aside an agency decision must also establish that it was "substantially prejudiced" by such an error, and Craft has not met that burden. See G. L. c. 30A, § 14 (7) ; Fitchburg Gas & Elec. Light Co. v. Department of Telecomm. & Energy, 440 Mass. 625, 641, 801 N.E.2d 220 (2004).
As the commission points out, the violation report -- stipulated to by Craft -- establishes the common ownership between numerous third-party companies and their licensed § 12 retailers. For example, one management company lists a single individual as its president, treasurer, secretary, and director; this individual *692 is **525 also listed as the president of all four restaurant or bar retailers affiliated with that management company. Similar fact patterns are evident as to the other involved retailer groups and their associated third-party firms. To the extent that the commission erroneously relied on administrative documents to reach that same conclusion, Craft cannot show that its substantial rights were prejudiced. Accordingly, we discern no reason to set aside the commission's finding that Craft violated § 2.08 and the penalty imposed.[13]
c. Regulatory violations -- Rebel. The commission concluded that 204 Code Mass. Regs. § 2.08"applies to a retail licensee's receipt of an inducement (emphasis added)," and that Rebel therefore violated the regulation by accepting the money that Craft paid in order to induce Rebel's restaurants to carry Craft-distributed brands. The commission relied on the language in the regulation providing that "[n]o licensee shall ... permit to be given money," and declared that this language "prohibits [both] active solicitation of an inducement by a [retail] licensee ... [and] passive acceptance of an inducement." Rebel, however, contends that the regulation does not envision enforcement against the party receiving inducements -- only those giving them. We conclude that the commission's interpretation of § 2.08 regarding a licensee's receipt of money is an error of law, and that § 2.08 cannot be enforced against Rebel solely because it received money as an inducement to purchase certain brands of alcoholic beverages sold by Craft.
We are loath to accept an interpretation of an agency regulation that is bound to lead to "absurd consequences." See Commonwealth v. Buccella, 434 Mass. 473, 482, 751 N.E.2d 373 (2001), cert. denied, 534 U.S. 1079, 122 S.Ct. 810, 151 L.Ed.2d 695 (2002). That outcome is assured if we were to apply the regulation's plain language to retail licensees. As the commission has applied the regulation to Rebel, it states: "No licensee [Rebel] shall ... permit to be given money ... in any effort to induce any person [Rebel Marketing] to persuade or influence any other person [Rebel] to purchase ... alcoholic beverages." In other words, in order to apply § 2.08 to a retailer in receipt of inducement money, the commission must find that the retailer **526 intended to persuade itself to purchase a brand of alcoholic beverages. We need not -- and do not -- endorse this tortured reading of the regulation. Cf. Green v. Board of Appeal of Norwood, 358 Mass. 253, 258, 263 N.E.2d 423 (1970) (avoiding "absurd or unreasonable results" where statutory language "susceptible of a sensible meaning").
The most sensible reading of the "[n]o licensee shall give or permit to be given" phrase of § 2.08 is that it prohibits a licensee from itself giving money as an inducement or authorizing or allowing an agent -- or a proverbial "bagman" -- to give money as an inducement, not that it prohibits a licensee from allowing itself to receive an inducement, as the commission urges. In the 1935 set of regulations in which § 2.08 was originally promulgated (as Regulation 47), the word "permit" appears as a verb in at least five other regulations. Those regulations state in relevant part as follows:
*693 "15. No licensee shall use, or permit to be used, any advertising matter which is false or untrue ...."
"16. No licensee shall make or permit to be made by his agent or employee, any false or misleading statement concerning any other licensee, his products, or the conduct of his business."
"21. No licensee for the sale of alcoholic beverages shall permit any disorder, disturbance or illegality of any kind of take place in or on the licensed premises. The licensee shall be responsible therefor, whether present or not."
"24. 'Package Goods' Store licensees shall not permit any alcoholic beverages to be consumed on their licensed premises."
"40. No false, deceptive or misleading statement shall be made or used, or permitted to be made or used, by any licensee on any label on any keg, cask, barrel, bottle or other container of any alcoholic beverages."
In each of these regulations, the word "permit" is used to prohibit a licensee from authorizing or allowing another person to engage in prohibited conduct. There is no reason to believe that the commission intended a different meaning when it drafted Regulation 47's prohibition that "[n]o licensee shall give or permit to be given money." See **527 TBI, Inc. v. Board of Health of N. Andover, 431 Mass. 9, 15, 725 N.E.2d 188 (2000) ("the provisions [of a regulation] should be interpreted in a way that is harmonious").
It is also noteworthy, where § 2.08 is essentially a prohibition of commercial bribery in the alcoholic beverage industry, that the State commercial bribery statute that was in effect in 1935 expressly distinguished between persons who "corruptly give[ ], offer[ ] or promise[ ] ... any gift or gratuity whatever, with intent to influence" and persons who "corruptly request[ ] or accept[ ]" such things. G. L. (Ter. Ed.) c. 271, § 39, as amended by St. 1912, c. 495. Given this statutory background, the commission could have drafted Regulation 47 so that it also barred licensees from receiving inducements, but it did not do so.
The commission's failure expressly to prohibit licensees from receiving inducements is consistent with the legislative purpose of the Liquor Control Act, which sought to protect against the undue influence of powerful manufacturers of alcoholic beverages, fearing that their influence would allow them to dominate the wholesale sector and eventually disrupt the business of small retailers. See Report of the Special Committee, supra at 16; Seagram Distillers Co., 401 Mass. at 716, 519 N.E.2d 276 ; de Ganahl, supra at 669. There is much in the legislative history of the statute to indicate that the Legislature wanted the commission to exercise its authority to penalize manufacturers or large wholesalers that were using commercial bribery to control the purchasing behavior of § 12 retailers -- that is, licensed bars and restaurants; there is nothing to indicate that the Legislature wanted the commission to penalize the § 12 retailers that were receiving these commercial bribes. See TBI, Inc., 431 Mass. at 15, 725 N.E.2d 188 (we construe regulations in manner "consistent with the legislative design").
Although we are generous in our deference to administrative agencies in their interpretation of their own regulations, see Commerce Ins. Co., 447 Mass. at 481, 852 N.E.2d 1061, that deference is not unlimited. Here, the commission's decision against Rebel was premised upon an error of law. Because we conclude that § 2.08 cannot be applied against licensees in receipt of inducements, the Superior Court judgment in favor of the commission must be reversed, and the matter remanded to *694 the Superior Court for entry of judgment in favor of Rebel.
Conclusion. The order of the Superior Court granting the commission's cross motion for judgment on the pleadings with respect to Craft is affirmed. The order of the Superior Court granting the commission's cross motion for judgment on the pleadings **528 with respect to Rebel is reversed, and that case is remanded with instruction to enter judgment in favor of Rebel.
So ordered.

We acknowledge the amicus brief submitted by Beer Distributors of Massachusetts, Inc.

The Liquor Control Act provides for a three-tiered legal framework in which "alcohol products sold ... by manufacturers or suppliers be sold initially to licensed Massachusetts wholesalers .... [who] in turn sell to retailers." Heublein, Inc. v. Capital Distrib. Co., 434 Mass. 698, 699, 751 N.E.2d 410 (2001).
Under G. L. c. 138, § 19, the commission is authorized to issue licenses to manufacture alcoholic beverages. Throughout this opinion, as a result of terminology employed by the commission and used throughout the legislative history of the statute, § 19 licensees are interchangeably referred to as "manufacturers," "suppliers," "breweries," and "brewers."
Under G. L. c. 138, § 18, the commission is authorized to issue licenses to wholesalers and importers of alcoholic beverages, which we also refer to as "distributors" in this opinion. Licensed wholesalers are permitted "to sell for resale to other licensees under this chapter alcoholic beverages manufactured by any manufacturer licensed under the provisions of [§ 19 ]." G. L. c. 138, § 18.
Under G. L. c. 138, § 12, the commission is authorized to issue licenses to bars, restaurants, hotels, and other venues where alcoholic beverages are sold and consumed on the premises, which we refer to as "retailers" or "§ 12 retailers" in this opinion.
Under G. L. c. 138, § 15, the commission is authorized to issue licenses to liquor stores where alcoholic beverages are sold to be consumed off premises. See Peoples Super Liquor Stores, Inc. v. Jenkins, 432 F.Supp.2d 200, 204 (D. Mass. 2006). Our opinion today does not concern retailers licensed pursuant to § 15.

The commission equivocated as to which particular parties were involved in this scheme for the purpose of determining whether Craft violated 204 Code Mass. Regs. § 2.08. According to the commission, Craft can be held liable under the regulation on three separate grounds: (1) because Craft gave money to its own employees to induce retailers to carry Craft brands; (2) because Craft gave money to the third-party management or marketing companies to induce their associated retailers to carry Craft brands; or (3) because beer suppliers gave money to Craft to induce the retailers to purchase Craft brands. Because Craft does not now challenge the sufficiency of any of these alternative theories, we rest our affirmance only on the second theory and defer any assessment of the sufficiency of the other two theories to another day. See First Nat'l Bank of Boston v. Haufler, 377 Mass. 209, 211, 385 N.E.2d 970 (1979) (declining to review issue "not briefed and argued before us").

With the assent of the commission, the Superior Court judge who heard Rebel's appeal stayed the suspension, and that stay remains in force pending our decision.

The commission is now organized under G. L. c. 10, §§ 70 -72, which outlines its membership composition and statutory duties.

After subsection (b ) was repealed, the Legislature enacted a new provision of G. L. c. 138, § 25A, inserted by St. 1971, c. 494, the so-called "post and hold" clause, which provided:
"All price lists or price quotations made to a licensee by a wholesaler shall remain in effect for at least thirty days after the establishment of such price list or quotation. Any sale by a wholesaler of any alcoholic beverages at prices lower than the price reflected in such price list or quotation within such thirty day period shall constitute price discrimination under this section."
In 1998, a judge of the United States District Court for the District of Massachusetts invalidated the post and hold clause, concluding that it violated the Sherman Act, 15 U.S.C. § 1. Canterbury Liquors & Pantry v. Sullivan, 16 F.Supp.2d 41, 51 (D. Mass. 1998). Accordingly, the only legally effective provision of § 25A as it stands today is subsection (a ), the clause governing price discrimination.

Perhaps the best evidence of this assertion is that the penalties imposed in these cases were the first penalties ever imposed by the commission for violations of 204 Code Mass. Regs. § 2.08.

Title 27 U.S.C. § 205(c) states in relevant part:
"It shall be unlawful for any person engaged in business as a distiller, brewer, ... or other producer, or as an importer or wholesaler, of distilled spirits, wine, or malt beverages, ... directly or indirectly or through an affiliate:
"...
"To induce through any of the following means, any trade buyer engaged in the sale of distilled spirits, wine, or malt beverages, to purchase any such products from such person to the exclusion in whole or in part of distilled spirits, wine, or malt beverages sold or offered for sale by other persons in interstate or foreign commerce, if such inducement is made in the course of interstate or foreign commerce, or if such person engages in the practice of using such means ... to such an extent as substantially to restrain or prevent transactions in interstate or foreign commerce in any such products, or if the direct effect of such inducement is to prevent, deter, hinder, or restrict other persons from selling or offering for sale any such products to such trade buyer in interstate or foreign commerce: (1) By commercial bribery; or (2) by offering or giving any bonus, premium, or compensation to any officer, or employee, or representative of the trade buyer ...."

As discussed infra, we also conclude that Rebel did not violate 204 Code Mass. Regs. § 2.08.

Craft's assertion that the commission used these administrative records to draw an inference that inducements were paid from management companies to retailers is of no moment here. As discussed supra, it is Craft's conduct -- and its underlying motive in giving money to another person -- that is necessary to establish a violation of 204 Code Mass. Regs. § 2.08. Whether that money actually reached the retailers was unnecessary to the commission's decision as to Craft.

Craft asks that we consider reducing or otherwise revising the penalty imposed by the commission. Aside from a cursory request in the concluding paragraph of its brief, Craft has not meaningfully presented this argument, and we thus consider it waived. See Commonwealth v. Appleby, 389 Mass. 359, 380, 450 N.E.2d 1070, cert. denied, 464 U.S. 941, 104 S.Ct. 357, 78 L.Ed.2d 320 (1983).