SUPREME JUDICIAL COURT 
 
 ARROWOOD INDEMNITY COMPANY vs. WORKERS' COMPENSATION TRUST FUND

 
 Docket:
 SJC-13696
 
 
 Dates:
 March 5, 2025 - July 1, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, & Georges, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Workers' Compensation Act, Reimbursement of insurer, Subsequent injury, Decision of Industrial Accident Reviewing Board. Department of Industrial Accidents. Insurance, Workers' compensation insurance. Administrative Law, Agency's interpretation of statute. Statute, Construction
 
 

             Appeal from a decision of the Industrial Accident Reviewing Board.
            After review by the Appeals Court, 104 Mass. App. Ct. 419 (2024), the Supreme Judicial Court granted leave to obtain further appellate review.
            Eric A. Smith for the plaintiff.
            Douglas S. Martland, Assistant Attorney General (Arjun Jaikumar, Assistant Attorney General, also present) for the defendant.
            Ben Robbins & Natalie Logan, for New England Legal Foundation, amicus curiae, submitted a brief.
            KAFKER, J.  The parties in this case have been engaged in a multiyear dispute over an insurer's statutory entitlement to second-injury reimbursements under the Massachusetts workers' compensation act (act), G. L. c. 152, §§ 37 and 65.  We hold, as did the Appeals Court, that insurers in "run-off"[1] are not precluded by statute from receiving second-injury reimbursements when such insurers have paid out the associated workers' compensation benefits to an injured employee.  We therefore reverse the Department of Industrial Accidents (DIA) reviewing board's (board's) decision denying such reimbursement to the plaintiff insurer.  Neither the plain language of the statutory reimbursement exclusions in §§ 37 and 65 nor the statutory enforcement mechanism as a whole supports the board's interpretation.[2]
            1.  Background.  a.  Statutory scheme.  The act was passed in 1911 as a "response to strong public sentiment that the remedies afforded by actions of tort at common law did not provide adequate protections to workers."  Mendes's Case, 486 Mass. 139, 140 (2020), quoting Neff v. Commissioner of the Dep't of Indus. Accs., 421 Mass. 70, 73 (1995), and citing Young v. Duncan, 218 Mass. 346, 349 (1914).  See St. 1911, c. 751.  In 1919, the Legislature amended the act to create a State fund from which previously injured employees who sustain a further work-related injury (a "second injury"), the severity of which is exacerbated by the prior injury, are paid a portion of the compensation to which they are entitled.  See St. 1919, c. 272, §§ 1-2.
            The purpose of the fund, now known as the Workers' Compensation Trust Fund (trust fund) and administered by the DIA, is
"to encourage the employment of persons who have previously suffered certain defined personal injuries by relieving the employer or the insurer from the burden of paying the entire compensation for further disability of the employee due to the combined effect of his previous injury and one later received in the course of his employment."
American Mut. Liab. Ins. Co. v. Commonwealth, 379 Mass. 398, 402 (1979), quoting McLean's Case, 326 Mass. 72, 74 (1950), and citing Fallon's Case, 322 Mass. 61, 62 (1947).
            The trust fund's revenue is generated by assessments paid into the trust fund by Massachusetts employers.  G. L. c. 152, § 65 (2), second par.  The trust fund relies on insurers to "bill and collect" these employer assessments alongside employers' premium payments for workers' compensation insurance policies.  See G. L. c. 152, § 65 (5), first par.  Insurers then transmit the assessments to the trust fund quarterly and are subject to fines and liens if they fail to do so.  G. L. c. 152, § 65 (5), first & second pars.
            If an employer pays into the trust fund via the requisite assessments, the employer's insurer is eligible, after "the first one hundred and four weeks from the onset of [an employee's second injury]," to be reimbursed by the trust fund for up to seventy-five percent of workers' compensation payments due under the employer's policy.  G. L. c. 152, §§ 37, second par., 65 (2), first par.  The insurer then reduces the employer's corresponding claims by the reimbursement amount and accordingly adjusts the employer's associated "experience rating," a factor used by insurers to calculate an employer's insurance premiums.[3]  See G. L. c. 152, § 53A (4) ("Where a claim against an insured that has affected such insured's experience rating . . . has been reimbursed by . . . the [trust fund] for payments made pursuant to [§ 65 (2)], the insurer shall submit a revised statistical unit report to the appropriate rating bureau . . .").
            The act permits certain employers to "opt out" of paying assessments to the trust fund, subject to the condition that these employers cannot benefit from specified trust fund reimbursements.  See G. L. c. 152, §§ 37, second par., 65 (2), first par.  See also Markos-Waiswilos v. Salem Hosp., 67 Mass. App. Ct. 904, 904 (2006) (describing 1991 amendments to G. L. c. 152, including schematic change from mandatory employer participation to inclusion of "opt-out" provision).  Such employers fall into three categories:  "non-insuring public employer[s]," "self-insurer[s]," and "self-insurance group[s] which ha[ve] chosen not to participate in the fund."  G. L. c. 152, § 65 (2), first par.  See G. L. c. 152, § 37, second par. (to receive reimbursement, employer may not be "a self-insurer, a group self-insurer or municipality that has chosen not to be subject to the assessments which fund said reimbursements").
            Sections 37 and 65 of the act are explicit in their exclusion of these nonparticipating employers from the trust fund's reimbursement provisions.  Section 65 bars such employers from receiving a variety of reimbursement types from the trust fund, including second-injury reimbursements, as follows:
"There is hereby established a trust fund in the state treasury, known as [the trust fund], the proceeds of which shall be used to pay or reimburse the following compensation:  . . . (c) reimbursement of certain apportioned benefits pursuant to [§ 37] . . . .  No reimbursements from the [trust fund] shall be made under clauses (a) to (g), inclusive, to any non-insuring public employer, self-insurer or self-insurance group which has chosen not to participate in the fund as hereinafter provided." (Emphases added.)
G. L. c. 152, § 65 (2), first par.  Similarly, § 37 specifically prohibits nonparticipating employers from receiving second-injury reimbursements:
"Insurers making payments under this section shall be reimbursed by the state treasurer from the trust fund . . . in an amount not to exceed seventy-five percent of all compensation due . . . ; provided, however, that the insurer is not a self-insurer, a group self-insurer or municipality that has chosen not to be subject to the assessments which fund said reimbursements . . ." (emphasis added).
G. L. c. 152, § 37, second par.
            Relevant to this appeal, a "self-insurer," as defined by the act, is an employer who annually obtains a "license as a self-insurer" from the DIA and provides the mandatory workers' compensation benefits to employees on its own, rather than through an insurance company.  See G. L. c. 152, § 25A (2).  A "self-insurance group" is an association or corporation "consisting of five or more employers" who 
"are engaged in the same or similar type of business, who are members of the same bona fide industry, trade or professional association which has been in existence for not less than two years or who are parties to the same or related collective bargaining agreements, and who enter into agreements to pool their liabilities for workers' compensation benefits and employer's liability in this state."
G. L. c. 152, § 25E, tenth par.
            In the case before us, we are asked to determine whether the statutory reimbursement exceptions in G. L. c. 152, §§ 37 and 65, preclude an insurer in run-off from receiving second-injury reimbursements from the trust fund.
            b.  Facts.  Arrowood Indemnity Company (Arrowood) is a licensed insurer[4] in Massachusetts and the successor entity to several now-defunct insurance companies.[5]  From January 2001 to January 2002, Arrowood insured Scully Signal Company (Scully) for workers' compensation in Massachusetts.
            In 1994, a Scully employee sustained a work-related back injury necessitating surgical treatment.  He returned to work at Scully but experienced chronic lower back pain in the following years.  In January 2001, the employee sustained a second work-related back injury, such that an impartial examiner later concluded that the employee would "probably . . . not return to any substantial gainful employment."  Arrowood initiated payment to the employee under Scully's workers' compensation insurance policy that month.
            Arrowood entered run-off in 2003.  In this status, Arrowood stopped issuing new insurance policies but continued to administer and pay claims under its previously issued policies, including the policy under which the Scully employee received workers' compensation.  With Arrowood no longer available to issue new policies, Scully obtained workers' compensation insurance policies from other licensed insurers in Massachusetts going forward.  Scully continued to pay the mandatory assessments to the trust fund via these insurers and, in doing so, remained a trust fund participant after moving on from Arrowood.
            Because Arrowood no longer collected premiums from employers while it was in run-off, it also no longer collected the employers' mandatory assessments to transmit to the trust fund.  Pursuant to its ongoing reporting obligations under the act, however, Arrowood continued to file the requisite documentation with the trust fund, known as "Form 50s," on a quarterly basis.  In these filings, Arrowood reported zero premiums paid and, consequently, zero assessments collected or transmitted to the trust fund. 
            In 2005, pursuant to G. L. c. 152, § 37, Arrowood filed a petition for second-injury reimbursements from the trust fund for Arrowood's payments to the Scully employee.  After the employee settled his injury claim against Scully in 2008, Arrowood and the trust fund entered into a separate settlement agreement regarding Arrowood's § 37 reimbursements in 2009.  Under this settlement, the trust fund reimbursed Arrowood $293,637.94, or eighty-five percent of seventy-five percent of the eligible medical benefits paid to the employee from January 2001 to November 2008, and agreed to reimburse eighty-five percent of seventy-five percent of the employee's ongoing medical benefits (§ 37 settlement agreement).
            Pursuant to the § 37 settlement agreement, Arrowood continued to request and receive second-injury reimbursements from the trust fund through November 2013.  In 2015, however, the trust fund began denying Arrowood's reimbursement requests under Panu v. Chrysler Motors Corp., 28 Mass. Workers' Comp. Rep. 91 (2014), aff'd, Home Ins. Co. v. Workers' Compensation Trust Fund, 88 Mass. App. Ct. 189 (2015) (Home).
            Panu, in relevant part, involved a dispute between the trust fund and an insurer that, while in run-off, was not reimbursed for cost-of-living adjustments (COLAs) it paid out to eleven individuals receiving workers' compensation benefits through the insurers' policies.  In denying these reimbursements, the board reasoned that 
"[w]hile there was no formal 'opt-out' by the employers [insured by the insurer], the end result [of the insurer entering run-off] was the same –- the assessments that would have funded any reimbursement for COLA benefits were not paid into the [trust fund] by [the insurer]. . . .  Just as a self-insurer that has chosen to 'opt-out' suffers the loss of its right to reimbursement, an insolvent insurer that no longer reports the assessment base amount, collects the assessments, and pays them over to the [trust fund], must also lose its right to receive COLA reimbursements."
Panu, 28 Mass. Workers' Comp. Rep. at 105-106.  Thus, even if an insurer in run-off remained obligated to pay out benefits, it could no longer seek reimbursement if, as a consequence of its run-off status, it no longer collected and transmitted assessments to the trust fund.  See id.  In Home, the Appeals Court deferred to this reasoning and affirmed Panu.  Home, 88 Mass. App. Ct. at 193-194.[6]
            Because Arrowood was in run-off, and therefore no longer collecting and transmitting employer assessments to the trust fund while in this status, the trust fund, adopting the reasoning of Panu and Home, asserted that Arrowood was no longer eligible for second-injury reimbursements pursuant to G. L. c. 152, §§ 37 and 65.  The trust fund later explained the denials in a 2016 e-mail message to Arrowood's counsel, stating that it "could not process" such reimbursement requests "until the assessment issues are resolved."  
            c.  Procedural history.  Pursuant to G. L. c. 152, §§ 12 (1) and 19 (1), Arrowood filed a complaint in Superior Court in 2015 for enforcement of the § 37 settlement agreement with the trust fund.  The Superior Court determined that the reimbursement denials "should be fully reviewed administratively" first and dismissed the complaint without prejudice to Arrowood's right to seek judicial review of the DIA's final decision.  The Appeals Court affirmed the dismissal.  Arrowood Indem. Co. v. Workers' Compensation Trust Fund, 89 Mass. App. Ct. 1125 (2016).
            Arrowood next pursued the DIA's dispute resolution process.  After a conference held pursuant to G. L. c. 152, § 10A, the DIA issued a denial order in November 2016, from which Arrowood appealed.  An evidentiary hearing before a DIA administrative judge took place in 2018.  Relying on Panu and Home, the administrative judge again denied Arrowood's claim.  Arrowood appealed from the administrative judge's decision to the board, which affirmed the decision in March 2022 after a hearing.
            Arrowood appealed from this affirmance to the Appeals Court, which reversed the board and abrogated Home.  See Arrowood Indem. Co. v. Workers' Compensation Trust Fund, 104 Mass. App. Ct. 419, 424-425 (2024).  In doing so, the Appeals Court explained:
"In retrospect, we accorded too much deference to the reviewing board's decision, at the expense of the language of the statute.  Because the statute's plain language does not support the reviewing board's interpretation, we must depart from our pronouncement in Home and now reverse the decision of the reviewing board."
Id. at 425.
            We allowed the trust fund's application for further appellate review.  As discussed in greater detail infra, we agree with the Appeals Court's reasoning and interpretation of the statutory provisions at issue in this case.
            2.  Discussion.  a.  Standard of review.  Pursuant to G. L. c. 152, § 12 (2), "[a]n aggrieved party may seek judicial review of a decision of the board concerning workers' compensation benefits."  Carpenter's Case, 456 Mass. 436, 439 (2010).  Among other specified grounds, a reviewing court may reverse or modify the board's decision if it is "[b]ased upon an error of law."  G. L. c. 30A, § 14 (7) (c).  The board's interpretation of G. L. c. 152, §§ 37 and 65 (2), presents a question of law and is therefore reviewed de novo.  See Hartnett v. Contributory Retirement Appeal Bd., 494 Mass. 612, 616 (2024) ("[w]here an agency determination involves a question of law, it is subject to de novo judicial review" [citation omitted]); Craft Beer Guild, LLC v. Alcoholic Beverages Control Comm'n, 481 Mass. 506, 512 (2019).
            "The interpretation of a statute by the agency charged with primary responsibility for administering it is entitled to substantial deference" (citation omitted).  Mendes's Case, 486 Mass. at 143.  Accordingly, we give "due weight" to the "experience, technical competence, and specialized knowledge" of the board.  G. L. c. 30A, § 14 (7).  The duty of statutory interpretation properly lies with the courts, however, and our requisite deference to the board "does not suggest abdication."  Craft Beer Guild, LLC, 481 Mass. at 512.  See Mendes's Case, supra at 143-144; Moss's Case, 451 Mass. 704, 709 (2008).  An "incorrect interpretation of a statute is not entitled to deference" (alteration omitted).  Craft Beer Guild, LLC, supra, quoting Commerce Ins. Co. v. Commissioner of Ins., 447 Mass. 478, 481 (2006).
            For the reasons discussed infra, the board's interpretation of G. L. c. 152, §§ 37 and 65 (2), is not supported by the plain language of the act, nor is it compelled by, or consistent with, the trust fund's statutory funding mechanism as a whole.  We therefore reverse the board's decision to deny § 37 second-injury reimbursements to Arrowood.
            b.  Analysis.  In interpreting the act's provisions for second-injury reimbursements, we are guided by our fundamental approach to statutory interpretation:
"[A] statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated."
Vita v. New England Baptist Hosp., 494 Mass. 824, 834 (2024), quoting Harvard Crimson, Inc. v. President & Fellows of Harvard College, 445 Mass. 745, 749 (2006).  "Where the language of a statute is plain and unambiguous, it is conclusive as to legislative intent" (alteration omitted).  Garcia v. Executive Office of Hous. & Livable Communities, 495 Mass. 86, 91 (2024), quoting Hartnett, 494 Mass. at 616.  Our reading focuses on the "statutory scheme as a whole . . . so as to produce an internal consistency within the statute."  Matter of the Estate of Mason, 493 Mass. 148, 152 (2023), quoting Plymouth Retirement Bd. v. Contributory Retirement Appeal Bd., 483 Mass. 600, 605 (2019).
            The trust fund contends that there is a "gap" in G. L. c. 152, §§ 37 and 65, as these provisions do not "expressly address whether an insurer in 'run-off' . . . is eligible for [second-injury] reimbursement."  In the trust fund's view, because the Legislature has not "spoken with certainty" on insurers in this status, the trust fund is entitled to "spell[] out in the first instance" the statute's application here (quotation and citation omitted).  See Zoning Bd. of Appeals of Amesbury v. Housing Appeals Comm., 457 Mass. 748, 759 (2010).  The trust fund asks that we defer to its interpretation of the act's second-injury reimbursement provisions, as its interpretation is both "reasonable and longstanding."  As the trust fund's interpretation is not supported by either the plain language or over-all structure of the act, we reject it.
            In construing G. L. c. 152, §§ 37 and 65, "we begin, as we must, with the plain and ordinary meaning of the statutory language."  480 McClellan LLC v. Assessors of Boston, 495 Mass. 333, 345 (2025).  See Vita, 494 Mass. at 834; Matter of the Estate of Mason, 493 Mass. at 151-152.  To interpret §§ 37 and 65 as excluding insurers in run-off from second-injury reimbursements, as the trust fund does, would contradict the plain meaning of these statutory provisions.
            The act enumerates three categories of nonparticipating employers that are excluded from trust fund reimbursements.  In § 65, the Legislature specifically excepted "any non-insuring public employer, self-insurer or self-insurance group which has chosen not to participate in the fund."  G. L. c. 152, § 65 (2), first par.  Section 37 again explicitly designates these three categories as the exceptions to second-injury reimbursement eligibility:  "a self-insurer, a group self-insurer or municipality that has chosen not to be subject to the assessments which fund said reimbursements."  G. L. c. 152, § 37, second par.  By contrast, neither of these categorical lists includes insurers in run-off, nor does the plain meaning or statutory definitions of these categorical terms include insurers in run-off.  See G. L. c. 152, §§ 37, 65 (2).  See also G. L. c. 152, §§ 25A (2), 25E, tenth par. (respectively defining "self-insurer" and "self-insurance group").
            "The statutory expression of one thing is an implied exclusion of other things omitted from the statute" (quotation and citation omitted).  DiMasi v. Secretary of the Commonwealth, 491 Mass. 186, 197 (2023).  Here, the repeated articulation of the three entity types ineligible for second-injury reimbursement, and the repeated omission of insurers in run-off from those articulations, necessarily implies that such insurers are not ineligible for reimbursement under the act.  See Garcia, 495 Mass. at 92-93; DiMasi, supra.  Cf. Commonwealth v. Russ R., 433 Mass. 515, 521 (2001) (where statute authorized three courts to issue order granting immunity to witnesses but did not include Juvenile Court in that authorization, Legislature evidently intended exclusion of Juvenile Court).  If the Legislature intended to exclude such insurers from second-injury reimbursement eligibility, "the wording of the statute could have easily reflected it.  It does not."[7]  DiMasi, supra, quoting Casseus v. Eastern Bus Co., 478 Mass. 786, 796 (2018).  See 2A N.J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 47:23 (7th ed. 2021 & Nov. 2024 update) (rule of statutory construction reflects "common-sense premise that when people say one thing, they do not mean something else").
            The trust fund's interpretation is also inconsistent with the over-all division and allocation of responsibilities between insurers and employers with respect to second-injury reimbursements.  Pursuant to the second paragraph of G. L. c. 152, § 65 (2), "[r]evenues for the . . . trust fund . . . shall be raised by an assessment on all employers subject to this chapter" (emphasis added).  Insurers, in contrast, "shall transmit assessments collected during each quarter" (emphasis added).  G. L. c. 152, § 65 (5), first par.  It is thus employers who pay into the trust fund, with insurers like Arrowood acting only as the legislatively designated conduit through which such payments are transferred from an employer to the trust fund.  See G. L. c. 152, § 65 (2), second par., (5), first par.  See also E.I. DuPont de Nemours & Co. v. Commonwealth, 65 Mass. App. Ct. 350, 354 (2005) ("The assessments paid by private employers constitute the budget available for reimbursements . . .").  Cf. Beatty's Case, 84 Mass. App. Ct. 565, 566 (2013) (insurers entitled to COLA reimbursements under G. L. c. 152, § 65, "so long as the insured employer participates in the assessment provisions that supply the revenues for the [trust fund]").  The statute therefore provides little to no support for the argument that insurers should not be reimbursed by the trust fund unless they continue to provide for the funding of the trust fund.  It is employers, not insurers, who pay for the trust fund, with insurers only facilitating the administration of such payments.[8] 
            The trust fund's assertion that Arrowood would receive a "windfall" if it were to receive the requested second-injury reimbursements while in run-off is also inaccurate.  Again, Arrowood, as required by Scully's insurance policy, has paid, and continues to pay, workers' compensation benefits to the injured employee.  Thus, any reimbursement received by Arrowood from the trust fund is not a profit to Arrowood, but a partial offset of Arrowood's already completed disbursements.  There is therefore no "windfall" for Arrowood when it receives the second-injury reimbursements to which it is entitled.
            3.  Conclusion.  For the foregoing reasons, we reverse the board's decision and remand to the board for further proceedings consistent with this opinion.
So ordered.
 
footnotes

 
            [1] An insurer in run-off no longer issues new insurance policies but continues to administer and pay claims under its previously issued policies.
            [2] We acknowledge the amicus brief submitted by the New England Legal Foundation.
            [3] Insurers "gather information about the insured's loss experience during the course of the policy period and use that information, in a process known as 'experience rating,' either to make retroactive pricing adjustments or prospective pricing adjustments for future policy periods."  Ben-Shahar & Logue, Outsourcing Regulation:  How Insurance Reduces Moral Hazard, 111 Mich. L. Rev. 197, 206 (2012).  See Abraham & Schwarcz, The Limits of Regulation by Insurance, 98 Ind. L.J. 215, 236 (2022) (experience rating is form of "risk-based pricing" through which insurers "take into account the insured's loss experience in past policy periods, either in the form of insurance claims or events associated with claims").  See also Deerfield Plastics Co. v. Hartford Ins. Co., 404 Mass. 484, 488 (1989) (identifying role of "certain established experience rating principles" in determining insured's annual premium charges).
            [4] Arrowood entered liquidation in November 2023.  Because the claim before us pertains only to reimbursements of payments made by Arrowood while in run-off, described infra, the subsequent change in Arrowood's status is not germane to our decision.
            [5] Arrowood is the successor entity to Connecticut Fire & Casualty, Connecticut Indemnity, Safeguard Insurance Company, and Security Insurance Company of Hartford.  For ease of reference, and because the various mergers through which Arrowood was created are immaterial to this case, we refer to the predecessor entities as "Arrowood."
            [6] Although the act's provisions for COLA reimbursements and second-injury reimbursement provisions do not perfectly overlap, the COLA-specific statutory exceptions are the same:
"Insurers shall be entitled to quarterly reimbursements for supplemental benefits, pursuant to [§ 65] . . . to the extent such supplemental benefits are due to the increase of greater than five percent in the average weekly wage in the commonwealth in any single year.  No self-insurer, self-insurance group or municipality that has chosen non-participation in the assessment provisions for funding such reimbursements pursuant to [§ 65] shall be entitled to such reimbursements" (emphasis added).
G. L. c. 152, § 34B (c).  COLA reimbursements are also subject to the same broader reimbursement provision in § 65 as second-injury reimbursements.  See G. L. c. 152, § 65 (2), first par.  The board's determination in Panu that the insurer in Home was ineligible for COLA reimbursements while in run-off was based on the same errors of statutory interpretation and logic on which the trust fund relies now, described infra.  See Home, 88 Mass. App. Ct. at 192.  See also Massachusetts Ins. Insolvency Fund v. Workers' Compensation Trust Fund, 496 Mass.     (2025) (identifying board's error of reasoning, based on Home, in denying Massachusetts Insurance Insolvency Fund's requests for COLA reimbursements).
            [7] The trust fund's conclusion that the Legislature implicitly adopted Home's reasoning and result when it amended G. L. c. 152, § 65, in 2016 "but did not change the controlling interpretation set out in [Home and Panu]" is also without merit.  The amendment to which the trust fund refers was part of a broader act concerning State audits, and it amended G. L. c. 152, § 65 (10), to state:  "The books and records of the special fund and trust fund shall be subject to an audit by the state auditor, in accordance with generally accepted government auditing standards, as often as the state auditor determines is necessary."  St. 2016, c. 463, § 38.  It did not address the substantive provisions of § 65, including § 65 (2).  See id.  Instead, the amendment concerned itself with the wholly unrelated issue of auditing schedules for various State entities.  See, e.g., St. 2016, c. 463, §§ 7, 23, 34 (adding, for example, comparable language to statutes involving the Children's Trust Fund, the Community Economic Development Assistance Corporation, and the Massachusetts Thoroughbred Breeders Association, Inc.).  We therefore find no basis on which to conclude that, in so amending G. L. c. 152, § 65, the Legislature approved of, or even considered, the interpretation of § 65 (2) affirmed in Home.
            [8] In the instant case, the employer of the injured employee has continued to contribute to the trust fund, making the trust fund's argument particularly weak.  Furthermore, even if that employer had gone out of business, which is a possibility emphasized by the trust fund, it would be other participating employers, not the insurance companies, that would have to make up the loss in trust fund revenues.  See G. L. c. 152, § 65 (3)(5) (participating employer's annual assessment owed to trust fund is pro rata relative to trust fund's estimated total need and employer's assessment base); G. L. c. 152, § 65 (4) (c) (Commissioner of Insurance may levy additional assessments on employers if disbursements from trust fund for compensation operating expenses exceed revenue generated by fiscal year's annual assessments).  The trust fund would continue to be paid for, regardless of the status of the insurer.